```
                    UNITED STATES DISTRICT COURT
                      DISTRICT OF NEW JERSEY

GOLDEN, et al.,                     .
                                    .
        Plaintiffs,                 .
                                    . Case No. 15-cv-08559
vs.                                 .
                                    . Newark, New Jersey
NEW JERSEY INSTITUTE OF             . March 5, 2018
TECHNOLOGY, et al.,                 .
                                    .
        Defendants.                 .



                     TRANSCRIPT OF HEARING
            BEFORE THE HONORABLE LEDA DUNN WETTRE
               UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

 For the Plaintiffs:    KATIE TOWNSEND, ESQ.
                        Reporters Committee for Freedom of
                        the Press
                        1156 15th Street NW
                        Suite 1250
                        Washington, DC 20005-1779
                        (800) 336-4243


 For the Defendants     GARY POTTERS, ESQ.
 New Jersey             Potters & Della Pietra LLP
 Institute of           100 Passaic Avenue
 Technology, Clara      Fairfield, NJ 07004
 Williams:              (973) 575-5240
                        gpotters@pdplawfirm.com


 Audio Operator:

 Transcription Service:    KING TRANSCRIPTION SERVICES
                           3 South Corporate Drive, Suite 203
                           Riverdale, NJ  07457
                           (973) 237-6080


Proceedings recorded by electronic sound recording; transcript
produced by transcription service.
```

```
 1   (APPEARANCES continued)

 2   For the Defendant        CHRISTOPHER D. AMORE, ESQ.
     Federal Bureau of        Office of the U.S. Attorney
 3   Investigation:           District of New Jersey
                              970 Broad Street
 4                            Suite 700
                              Newark, NJ 07102
 5                            (973) 645-2700
                              christopher.amore@usdoj.gov
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

 1              (Commencement of proceedings at 12:11 P.M.)

 2

 3              THE COURT:  All right.  Good afternoon, counsel.

 4    We're on the record in Golden and Locke versus NJIT,

 5    15-cv-8559.

 6              May I have appearances, please.

 7              MS. TOWNSEND:  Katie Townsend on behalf of

 8    plaintiffs Daniel Golden and Tracy Locke.

 9              THE COURT:  Good afternoon.

10              MR. POTTERS:  Good afternoon, Your Honor, Gary

11    Potters, Potters & Della Pietra on behalf of defendants New

12    Jersey Institute of Technology and Clara Williams, also

13    third-party plaintiffs.

14              THE COURT:  Good afternoon.

15              MR. AMORE:  Good afternoon, Your Honor, Christopher

16    Amore from the U.S. Attorney's Office on behalf of the

17    third-party defendants, the Federal Bureau of Investigation.

18              THE COURT:  Good afternoon.  And you're from this

19    office, then, in New York?

20              MR. AMORE:  Yes, Your Honor.

21              THE COURT:  Okay.  Very good.  So it's

22    Ms. Townsend's clients' motion, and I'll hear you first,

23    Ms. Townsend.

24              MS. TOWNSEND:  Would you like me up here,

25    Your Honor?

1           THE COURT:  Oh, wherever you're comfortable.  I

2    know that's not -- there's not a lot of room to put your

3    things, so you won't offend me if you go to the table.  I

4    wish I had a bigger lectern, but I don't.

5           MS. TOWNSEND:  I think it's -- I think it's fine.

6           THE COURT:  Okay.

7           MS. TOWNSEND:  Hopefully, I won't drop anything.

8           THE COURT:  Okay.  If you do, you're forgiven.

9           MS. TOWNSEND:  As plaintiffs laid out in our

10   briefing, Your Honor, this is really essentially a two-step

11   analysis for the Court.  The first question is are the

12   plaintiffs the prevailing parties?  And if the answer to that

13   is yes, the second step of the analysis is pretty

14   straightforward, because if they are the prevailing parties,

15   a fee award is mandatory under New Jersey's Open Public

16   Records Act.

17          In this case, because there hasn't been a court

18   order concerning disclosure -- in fact, there was what was

19   effectively a settlement with respect to disclosure -- in

20   order to determine whether or not plaintiffs are, in fact,

21   prevailing parties, the Court should look to the New Jersey

22   Supreme Court's decision or its analysis in Mason against

23   Hoboken of -- the City of Hoboken.  That case, which

24   recognized the catalyst theory, what we call the catalyst

25   theory, acknowledged that there really are really two factors

1    that the Court need to take into consideration.  Plaintiffs

2    are the prevailing parties if there's a factual causal nexus

3    between the relief they obtained and the litigation; so it's

4    effectively a causation requirement.  The second factor is

5    whether or not that relief had basis in law.

6              I think, as we pretty clearly laid out in our

7    briefing, Your Honor, plaintiffs in this case satisfy both of

8    those requirements.  Prior to this litigation being filed,

9    plaintiffs, Mr. Golden and Ms. Locke, made three Open Public

10   Records Act requests to the New Jersey Institute of

11   Technology.  The first request -- in response to the first

12   request, I should say, NJIT released 540 page of redacted,

13   really heavily redacted documents and indicated that it was

14   withholding in full, 4,000 pages of records.  With respect to

15   the second request and the third request --

16             THE COURT:  Let me ask you something.

17             MS. TOWNSEND:  Sure.

18             THE COURT:  And when they responded to the first

19   request with -- along with the production, they also asserted

20   some exemptions.  Correct?

21             MS. TOWNSEND:  That is correct, Your Honor.

22             THE COURT:  Okay.

23             MS. TOWNSEND:  They asserted exemptions under the

24   New Jersey Open Public Records Act, so they were all state

25   law exemptions.  Those were the same exemptions that were

1   cited in denying both the second and third requests in their

2   entirety.

3          So in response to all three requests NJIT asserted

4   that there were exemptions that justified nondisclosure under

5   OPRA.

6          THE COURT:  Okay.  And the first time those

7   exemptions were asserted is when they made the first

8   production.  Right?

9          MS. TOWNSEND:  That is correct, Your Honor.

10          THE COURT:  Okay.  And at that time that they made

11   the production, did they also make clear that they were

12   withholding certain documents at the behest of the FBI?

13          MS. TOWNSEND:  That's correct, Your Honor.  It was

14   our understanding at the time that what had occurred was that

15   the FBI had, in fact, indicated that those documents were

16   subject to OPRA exemptions and that NJIT was effectively

17   saying these are the OPRA exemptions.  We've received input

18   from the FBI regarding these exemptions, which, again, is not

19   a process that we've objected to.  I don't think we've ever

20   objected to the idea that NJIT could consult with the FBI

21   concerning whether or not they believe documents may or may

22   not be exempt from disclosure under OPRA.

23          THE COURT:  Okay.  So -- so is it your

24   understanding that the exemptions NJIT has served in response

25   to OPRA Request 1 were those that the FBI in effect asked

1   them to observe -- assert?

2           MS. TOWNSEND:  I think so, Your Honor.  I don't

3   know for sure.  But I believe that's the case.  I believe

4   that my understanding of what occurred is that NJIT informed

5   the FBI that it had received these OPRA requests and that

6   individuals from the FBI assisted or told NJIT in some way

7   what documents they -- NJIT should withhold in response to

8   the requests.  I believe that is what occurred.

9           THE COURT:  Okay.

10          MS. TOWNSEND:  After this litigation was filed --

11  so it was clear, in other words, that my clients' requests

12  had been denied, and documents were being withheld, in their

13  view, unlawfully under OPRA.  They initiated litigation.  And

14  I want to be clear, because think this is the distinction

15  between not only what occurred, the sort of factual scenario

16  that occurred in Mason, but I think also what occurred in

17  Spectraserve, which is the Appellate Division case that NJIT

18  relies quite heavily on its briefing.

19          This is not a situation where the agency was going

20  to comply or in the process of releasing records in response

21  to the OPRA requests.  This wasn't a situation where the same

22  records would have been released but for the fact that had

23  the -- I should say it this way.  The same records would have

24  been released, even if no litigation had been filed.  In

25  other words, my clients had been denied.  Their options were

1  walk away and get nothing or initiate litigation to challenge

2  the withholdings with respect to the first request and all of

3  the holdings with respect to the second and third requests.

4  So they chose that path.

5          Which is not only what they're entitled to do under

6  OPRA, but I would say is also what the statute intends and

7  incentivizes plaintiffs to do, to, if they've been wrongfully

8  or unlawfully denied access to public records, to pursue that

9  in litigation.

10          THE COURT:  But let me ask you something, because I

11  think that this is one of the critical questions.  So, you

12  know, under the factual causal nexus part of the catalyst

13  theory, I need to look at whether the behavior of the

14  custodian from whom you seek fees, changed as a result of the

15  OPRA lawsuit.

16          So I'm looking very carefully at what NJIT's

17  response was pre OPRA lawsuit and post OPRA lawsuit.  And it

18  seems as if there was a consistent position throughout, which

19  is we've been prohibited by the FBI -- and I know that you

20  disagree that they can be prohibited and that that is

21  commensurate with their duty under OPRA.  But the exemptions

22  we're asserting are even based on what the FBI is telling us.

23  And then post lawsuit, I'm very familiar with the process

24  that was undergone where the documents that were produced

25  were released by the FBI, that NJIT acted as a conduit to

1    send them from the FBI to Mr. Golden and you as they were

2    reviewed and released by the FBI.

3             So what behavior of NJIT changed as a result of the

4    filing of the OPRA lawsuit?

5             MS. TOWNSEND:  And I would say, Your Honor, you're

6    right to say that we sort of disagree with the premise that

7    it's okay for NJIT to simply say, well, this is the FBI's

8    responsibility, and we don't have to have anything to do with

9    it.  So we disagree with that premise.  I think that is

10   inconsistent with their statutory obligations under OPRA.

11            But even that aside, I think there was a change in

12   conduct, because we made a request and directed to -- or

13   plaintiffs made requests directed to NJIT.  NJIT effectively,

14   with respect to -- with the caveat that there were some

15   records released in response to the first request, denied

16   those requests.  They asserted exemptions under OPRA, and

17   they said you're not getting these records.

18            Once the litigation was filed, NJIT made it very

19   clear to the Court, as we point out in our filings, that they

20   were abandoning their reliance on those.  They did not stand

21   by -- I think, is the language -- with the exemptions that

22   had been asserted.  We agree --

23            THE COURT:  How did they abandon them?

24            MS. TOWNSEND:  They indicated that they would not

25   defend them.  And that they -- and I think at that point,

1   when you indicate that, that you don't defend them, I

2   think -- I can give you the cite to the letter that was

3   written, Your Honor, that we cite in our brief.

4             THE COURT:  Please do.

5             MS. TOWNSEND:  I believe it's the letter to Judge

6   Mitterhoff dated October 8th, 2015.  It -- I apologize, it

7   might be the December 17th, 2015, letter that we cited in

8   Footnote 1 to our brief, both on page 4.  Both of those, it's

9   ECF Number 1-3.

10            THE COURT:  The December letter was to me.  Right?

11            MS. TOWNSEND:  Yes, I apologize that was --

12            THE COURT:  So that's the letter you're relying on?

13            MS. TOWNSEND:  I believe it's -- I'm not sure which

14  one it is, but either of those -- I believe it's one of those

15  two letters where NJIT makes clear that it had no intention

16  or standing behind -- or it is the letter to you.  I

17  apologize.  It's access Number 5-2.

18            THE COURT:  ECF -- say that again.

19            MS. TOWNSEND:  ECF Number 5 --

20            THE COURT:  Number 5, at page 2 --

21            MS. TOWNSEND:  -- December 17th, 2015, at 2.

22            THE COURT:  Okay.

23            MS. TOWNSEND:  According to NJIT, the FBI advised

24  it that it was going to intervene in the state court

25  proceeding, as a means to stand behind its redactions and

1   directions, to withhold, in response to OPRA request, the

2   approximately 4,000 of documents, NJIT made it clear in that

3   correspondence, I believe it was that correspondence, it may

4   have been the letter to Judge Mitterhoff, that it was not

5   standing by those redactions.  That it was relying on the FBI

6   to do so.  It approached plaintiffs prior to suing the FBI to

7   bring it into the litigation, to ask for an extension of

8   time, so that the FBI could intervene.  We said that's fine.

9   We allowed that.

10          The FBI did not intervene.  The reason that the FBI

11  became a party to this litigation is because NJIT sued it,

12  not because of anything related to disclosures in this case.

13  Not because NJIT felt that it was rightfully or lawfully

14  withholding these records under OPRA.

15          I think the record is very clear that NJIT's

16  concern, primary concern, if not only concern, was attorney's

17  fees liability.  The indemnification claim that it filed

18  against the FBI at the very outset of this case was directed

19  to a potential attorney's fees claim, because NJIT's position

20  was, I think, we know there are unlawful withholdings here,

21  but we were told to do it by the FBI, so therefore, it's

22  okay.

23          THE COURT:  Well, I mean, I think you've got to

24  look at the context, and I lived through it to an extent as

25  well.  And the -- I recall it became pretty clear, once you

1    all were before me, that we had an understanding about how to

2    balance Mr. Golden's interest in getting the documents and

3    the FBI's assertions of security interests, if you will, in

4    the documents.

5            So I don't think -- I don't recall the NJIT ever

6    stating before me that they -- if litigated, they would not

7    stand behind the exemptions they had asserted.  I think they

8    sort of -- they were saying to the Court, the FBI has

9    highjacked, if you will, this process.  They're reviewing the

10   documents.  We're -- the documents are passing through us to

11   you.  So we're not going to be duking this out in a

12   litigation context.

13           But if I'm wrong about that, correct me, because

14   you all know the case much better than I do.  I've got

15   hundreds.

16           MS. TOWNSEND:  I think it's -- I wouldn't

17   necessarily say that the FBI highjacked the process.  I would

18   say that NJIT gave the process or attempted to hand the

19   process over to the FBI.  I mean, as we point out in our

20   briefing, Mr. Golden made similar requests to other

21   universities, who processed these OPRA -- not OPRA requests,

22   but these public records requests that were very similar and,

23   in fact, resulted in other universities giving us the exact

24   same records that were being withheld by NJIT under their own

25   public records laws.

1          THE COURT:  Well, let me ask you something in that

2     regard, and this, to me, is important too.  The cases are --

3     the few cases on the catalyst theory say it's a

4     fact-sensitive inquiry, and one of the things the Court must

5     look at is the reasonableness of the custodian's response.

6     And, you know, what -- I was struggling, as I read the

7     plaintiff's papers, to understand what response the

8     plaintiffs would have deemed reasonable, other than NJIT

9     completely ignoring the FBI's directives, which was cloaked

10    in national security terms, almost.  Not quite, but in "Do

11    not do this, we have a right -- this is our information.  Do

12    not disclose it."

13          So what -- what would have been reasonable other

14    than ignoring the FBI?

15          MS. TOWNSEND:  Well, at first, if I could go to the

16    legal point too on the reasonableness requirement, and I

17    would -- I would say that it's not quite as presented.  I

18    think in Mason, the Supreme Court made clear that when

19    evaluating the factual causal nexus prong of the catalyst

20    theory, the courts look to all the circumstances around it.

21    That is completely true.

22          And I think, again, in both Mason and --

23    Spectraserve, you're dealing with situations where the agency

24    was, in fact, releasing records.  It just wasn't doing it as

25    quickly as the plaintiffs in those cases wanted.  It wasn't a

 1    situation -- yeah, unlike here, where the plaintiffs had to

 2    litigate in order to get access to the records.  We had no

 3    choice.

 4           But I -- I would say that the only case that NJIT

 5    has cited for this idea that reasonableness is sort of an

 6    independent inquiry is the Path v. Borough of Garwood

 7    [phonetic] case, which is an unpublished appellate decision

 8    from -- or Appellate Division that relied solely on the

 9    common law right of access.

10           So I don't even think that we're in that world,

11    because once you establish prevailing party under the

12    catalyst theory, then OPRA mandates fees.  So there isn't a

13    sort of reasonableness exception.

14           But I will say this too --

15           THE COURT:  Well -- well, I -- you know, I counted,

16    because I did read carefully, and I take notes as I read

17    cases, and the reasonableness is discussed in Spectraserve,

18    Mason, Path v. Garwood, as you say, and Gannett.  And there

19    aren't that many catalyst cases.  So I think pretty much

20    every catalyst case discusses reasonableness.

21           MS. TOWNSEND:  And Gannett is a unique case.  I

22    wouldn't necessarily put that in the same category as both

23    Spectraserve, which, again, is factually unique as well, or

24    Mason, because in Gannett really what I think NJIT is relying

25    on is the dicta in the Gannett case where the court is

 1   indicating that when you have a situation somewhat -- I

 2   suppose, like this, where you have a federal agency that

 3   might be -- have an interest in the records, they should be

 4   notified.  They should be given an opportunity to weigh in.

 5           That's exactly what happened here.  So I'm not sure

 6   that Gannett really indicates -- really has a bearing here

 7   one way or the other, because I think that is what happened,

 8   and the FBI had an opportunity to weigh in.  They certainly

 9   had notice from the very outset of the plaintiffs' requests

10   and of the litigation, even before they were brought into it.

11           But I think the Court is right:  There isn't a lot

12   of case law.  I mean, we really are talking, I think, about

13   Mason at the Supreme Court level, and really about

14   Spectraserve in terms of the OPRA requirements.

15           But I will say this, because I understand what

16   Your Honor is getting to, even apart from the legal point,

17   sort of what was NJIT supposed to do?  And I think that there

18   were things that it certainly could have done prior to this

19   litigation that would have short-circuited it.  And the first

20   would have been to not deny the request and force

21   plaintiff -- and tell plaintiffs to go away or litigate.  I

22   mean, those were our only options at the outset because the

23   requests were denied.

24           Had NJIT wished to consult with the FBI, go through

25   essentially the process it went through really post law- --

|Hearing
|15-cv-08559, March 5, 2018                                                        16

1    during the course of litigation, I think it could have done

2    that.  It doesn't mean that plaintiffs would not --

3              THE COURT:  Had that process begun, though?  And

4    I'll look back at it in the record, but hadn't that process

5    begun at the time you filed the state court OPRA action?

6              MS. TOWNSEND:  So let's take the first request, for

7    example.  That happened -- that response happened --

8              THE COURT:  Because I remember Judge Mitterhoff was

9    quoted as saying, let's give the FBI some time to sort this

10   out.

11             MS. TOWNSEND:  To be clear with respect to the

12   facts, that process actually had not begun, unless you sort

13   of count -- maybe you are -- the kind of -- the review that

14   was done, not by counsel for the FBI, but rather by, I

15   believe, nonattorneys to the FBI with respect to the first

16   request.  Very much pre litigation.

17             After that and once the litigation was filed, the

18   FBI was not a party to the case.  They weren't really

19   involved.  There was a hearing before Judge Mitterhoff where

20   counsel for the FBI sort of appeared for the first time.  I

21   don't want to -- I very -- I want to be very careful not to

22   mischaracterize anything, but it was essentially the counsel

23   for the FBI saying we'd like some additional time to sort of

24   evaluate what we want to do so that none of this sort of

25   process in terms of the FBI acting as a sort of consultant in

1   reviewing records and then NJIT releasing those records,

2   that -- that really occurred before you, Your Honor.  And it

3   wasn't really until there was a change -- actually a change

4   of counsel for the FBI.  I think there was an original

5   attorney working on it.

6          So that process was not in play.  I mean, I think

7   it's fair to point back to what happened with respect to the

8   first request.  You could consider that a consultation to the

9   FBI.  The FBI reviewed some records, told NJIT what they

10  thought should be withheld.

11         I think the real problem or really what gets sort

12  of the meat of this is that it was NJIT's responsibility from

13  the very outset to review the records.  It's fine that it

14  consults with another agency, but it has to be willing to

15  stand by the exemptions that it's asserting.  These were its

16  records.  I don't think there's any dispute that these were

17  its records.  Just because it was communicating with a

18  federal agency doesn't mean that those are not its

19  communications.

20         We really worry about if NJIT's position with

21  respect to attorney's fees here is adopted, what does that

22  mean for the next case or the next OPRA requester who asks

23  NJIT, a public university, for communications between it and

24  the Department of Education?  Is this opening up a sort of

25  ambiguous situation where NJIT can say, we're going to deny

1    your requests and go away.  If you decide to sue and litigate

2    it, I'm going to sue the Department of Education to bring

3    them into the case, essentially, to create ambiguity --

4    ambiguity around the attorney's fees issue.

5            THE COURT:  But this is -- isn't one way to confine

6    any ill effect or anti-OPRA effect of this is consistent with

7    case law to look at, you know, why the custodian is doing it,

8    and because there are -- you know, in the case of Gannett,

9    there were, I guess, grand jury secrecy considerations --

10   confidentiality.  The case of Spectraserve, there was a

11   respect given even to a third party's commercial privacy

12   interests.

13           So in your hypothetical, to look at the -- it

14   depends.  If the Department of Education, what interests

15   they're asserting and asking the custodian -- one of the

16   custodians to stand down, because I think it's difficult when

17   you make a request that calls for a correspondence from the

18   FBI and the CIA to say, oh, just ignore all that and go ahead

19   and be a big boy, as custodian, and make your call

20   independent of that context, of the interests of third

21   parties, which the case law has said can be significant.

22           MS. TOWNSEND:  And, again, I don't think we were

23   asking or suggesting that NJIT should have ignored -- should

24   have just not reviewed the documents and just handed them

25   over.  I think, again, we've stated NJIT, in fact, had an

1    obligation to review the documents, could assert whatever

2    exemptions under OPRA it thought was appropriate.  If it had

3    questions about whether or not a specific document should be

4    exempt for some reason and it thinks -- and the FBI is the

5    only one that can answer that, of course, it can consult with

6    the FBI.

7              But I think NJIT has to be satisfied that what the

8    FBI is telling it is, in fact, compliant with OPRA.  I mean,

9    I think if you look at the some of records that were

10   ultimately released that are copies of my client's articles,

11   for example, that publicly available reports that are on

12   websites, things that are said -- you know, this is

13   unclassified, but please don't distribute it, things like --

14   of that nature.

15             THE COURT:  Were those subsequently released?

16             MS. TOWNSEND:  Those were subsequently released.

17             THE COURT:  Right.

18             MS. TOWNSEND:  And I think had --

19             THE COURT:  But sometimes when you have 5,000 pages

20   of documents, when you get to it, you realize, maybe there's

21   a banner on it that gives you pause, and then you have to

22   look through it.

23             So I understand.  That happens a lot in document

24   production.

25             MS. TOWNSEND:  Had NJIT reviewed these documents at

1    the outset when it -- it would have, I think, pretty clearly

2    realized, these are not documents that can be withheld under

3    OPRA.  And that's why they were released -- and when it --

4    finally when these documents were reviewed by somebody after

5    the litigation, they were released.  That's why they were

6    released.

7            THE COURT:  They were reviewed by the FBI.

8            But let me ask you something, and this doesn't

9    relate to -- plaintiffs didn't act in any respect improperly.

10   They acted fully in accordance with their rights under OPRA.

11   Yet, when you're assessing fees and reasonableness and so

12   forth, I can't deny that I thought about, was the plaintiffs'

13   decision to go after one of two custodians tactical?

14   Because, look, OPRA defines custodian as the party that has

15   custody or control.

16           Now, NJIT says, well, we weren't really a custodian

17   because the FBI asserted control.  But they had custody.  And

18   so did the FBI.  That information reside -- or the CIA -- it

19   resided on two different servers.  And I wonder -- and tell

20   me if I'm wrong -- if the same exact requests were served on

21   the FBI pursuant to FOIA, and the same result occurred and

22   FBI eventually released all these documents, post filing of

23   the lawsuit, could the plaintiffs have gotten fees from the

24   FBI?

25           MS. TOWNSEND:  Yes, Your Honor.  If -- if the

1  plain- -- FOIA also has a fee recovery provision, as NJIT has

2  pointed out in its briefing.

3         I think there are lots of reasons that requests for

4  particularly reporters will look at a situation where you

5  might have communications between a state and federal entity.

6  It's not an uncommon thing actually for a journalist --

7         THE COURT:  Sure.

8         MS. TOWNSEND:  -- requests.  And I would say maybe

9  it is a tactical reason, but I think not the reason that

10 you're thinking of, why reporters will often go to the state

11 entity, and that is because the FBI, as you can probably

12 imagine, gets a lot more FOIA requests than the New Jersey

13 Institute of Technology does.  And so typically they process

14 faster.

15         And so I -- I don't know what exactly was in

16 Mr. Golden's head, but I believe that's what was in

17 Mr. Golden's head.

18         And I will say this, he also did make FOIA requests

19 to the federal government for similar correspondence with

20 different universities.  With respect to public universities,

21 he generally went to the state entity, I believe, because he

22 assumed -- and in many cases this was, in fact, I think,

23 borne out by the fact that he documents very quickly, it was

24 a faster way to go.

25         Generally speaking, I don't think it's tactical in

1   the sense that this was designed to get attorney's fees.

2   It --

3            THE COURT:  I don't think it occurred to me, it

4   might be more tactical in the sense of which forum you want

5   to adjudicate before, because if you're going in under OPRA,

6   you have a state court that's very adept at these -- quite

7   accuse- -- accustomed to these applications.  They have a

8   faster process than we do.  They do it by order to show

9   cause.  You often get a decision on the return date.

10           MS. TOWNSEND:  That's right, Your Honor.  And this

11   litigation has been going on for two and a half years.  That

12   is -- I will tell you -- not what we anticipated when this

13   case began.

14           And I want to emphasize too, I think we pointed

15   this out in the briefing, but I think it's important to

16   emphasize, this case has been going on a long time.  The fees

17   are high.  The majority of those fees stem directly from

18   NJIT's position with respect to attorney's fees.  In other

19   words, in March 1st -- on March 1st, 2017, the parties really

20   ended what were discussions concerning disclosures,

21   particularly given the deadline for Mr. Golden's book, which

22   is now already published but which was pending.  He felt he

23   had enough to go forward.  He decided not to challenge

24   with -- remaining withholdings after some back and forth

25   between counsel- -- plaintiffs and counsel for the other

1    parties.  Reached effectively what was a settlement.

2             Since March 1st of 2017 -- we pointed this out in

3    our open brief -- the plaintiff's attorney has spent more

4    than a hundred hours addressing what was effectively whether

5    or not we were entitled to fees.

6             THE COURT:  That's a lot.

7             MS. TOWNSEND:  That's a lot.  And it's -- it's not

8    what we were anticipating.  It's not what we would have

9    wanted.  I think it's --

10            THE COURT:  And is that -- and that is fully

11   recoverable, fees to get fees?

12            MS. TOWNSEND:  Fees on fees are fully recoverable,

13   Your Honor.  And I think -- I -- I think that being said, I

14   also think it's important.  I think the fees issue in this

15   case is important, because the New Jersey legislature, when

16   it enacted a mandatory fee provision -- which I will tell you

17   is not as common.  There are states that have discretionary

18   fee shifting in public records cases.  That's a choice.

19   That's a legislative choice, and it's designed to remove

20   uncertainty.

21            And the kind of uncertainty that we're facing right

22   now, you know, I think it's -- it's a good thing that

23   Mr. Golden and Ms. Locke had counsel willing to take on this

24   case pro bono and willing to pursue the fees issue, because I

25   believe that it's an -- quite important.  I think, given

1    journalists -- given Mr. Golden or journalists like him,

2    given their views in terms of, you know, getting what they

3    wanted out of the litigation, I'm not so sure that if he were

4    paying full freight, that he would want to double the costs

5    of this litigation, arguing about fees.  And that's where we

6    are right now.

7            So I think I would leave with that.  I think, you

8    know, we outlined the sort of policy considerations in our

9    brief, but we think it's quite important to emphasize that

10   really what mandatory fee shifting does is provide certainty

11   to plaintiffs that if they pursue litigation where they

12   believe they will be successful on the law that even if they

13   reach a settlement, which is what the catalyst theory sort of

14   provides for -- and I think, frankly, should be encouraged.

15   I mean, I don't think we want to be in a position where we

16   reach agreement with all the parties, can you re- -- do what

17   we did in this case.  Could you look at some of these

18   withholdings and revaluate them?  We think we would be

19   willing to not challenge these other withholdings.

20           When the parties do that, I think that's

21   beneficial.  I think that's something that should be

22   encouraged.  I don't think it should be held against

23   plaintiffs in an attorney's fees dispute, that we decided to

24   resolve our disclosure issues without seeking a judgment,

25   because if we had a --

1          THE COURT:  Right.

2          MS. TOWNSEND:  -- court, a judgment, a ruling

3    requiring these documents to be released as opposed to just

4    reaching an agreement among the parties, this wouldn't even

5    be an issue, because we'd be the prevailing parties clearly.

6    The Court wouldn't even need to get into the catalyst theory.

7    And OPRA would mandate fees.

8          THE COURT:  I understand.  Let me ask a couple of

9    miscellaneous questions.  One is in the reply brief, you

10   brought out essentially an objection to the use of stipulated

11   facts.  I read all the facts that were actually submitted

12   under declaration first.  And I don't think the stipulated

13   facts really were anything that weren't already of record.

14   It maybe just put the FBI on record saying they agreed with

15   the facts as presented by NJIT.

16          So, you know, why don't you state what your

17   position is on the stipulated facts.  Do you disagree?  Is

18   there a particular stipulated fact that you object to the

19   Court considering, because it's not submitted under

20   declaration somewhere else?

21          MS. TOWNSEND:  I think, Your Honor, we would -- I

22   think there -- the stipulated facts certainly characterize

23   some facts, I think, in ways that are different from the

24   joint status reports that the parties submitted.  I mean, I

25   think it's very clear from joint status reports that were

 1   submitted, the parties all understood -- or at least the

 2   plaintiffs understood or thought that all the parties

 3   understood that this was a consult from the FBI, that was

 4   reflected in the correspondence that NJIT then later provided

 5   to the plaintiffs in conjunction with the productions.  I

 6   think that there's sort of an attempt to kind of

 7   recharacterize some of the facts.  I think, to be frank with

 8   you, some of the facts that are listed in the stipulated

 9   facts are actually helpful for us.

10          I think if you look at the language under

11   paragraphs 3, 4, and 5 that provide examples of the

12   dissemination controls that NJIT was relying upon, it makes

13   it kind of -- and particularly when you compare it to some of

14   what we point out in our reply, records that were released

15   that had these dissemination controls on them that were, in

16   fact, public records, it sort of undercuts NJIT's position

17   that they were very concerned about the national security

18   implications of some of these records and were -- I think

19   there's a lot of heightened language in NJIT's briefing that

20   suggests that we're talking about classified matters.  And,

21   of course, it's not at all what we're talking about.  No one

22   at NJIT, at least -- there's been no assertion, has the

23   necessary security clearances to view that kind of material.

24          So I -- I would say that I think our concern is

25   that to the extent NJIT and the FBI are agreeing to how some

 1  things should be characterized and stipulating to those

 2  facts, that's fine vis-à-vis NJIT and the FBI.  And they have

 3  an ongoing pending dispute over the event that there is an

 4  attorney's fee award to plaintiffs, who should pay that.  And

 5  I think that's certainly can be utilized by those two

 6  parties, because they've stipulated to it.

 7        I think our concern was by portraying this as a

 8  stipulated fact, suggests that plaintiffs have also

 9  stipulated to this when that, in fact, is not the case.  I

10  think that the correspondence and what has been averred to in

11  an evidentiary format is what this Court should look to.

12        THE COURT:  Okay.  One final thing and this is

13  more, perhaps, the Court's duty to figure out than yours, but

14  I just wondered if you've come across it.  This motion went

15  on my motion list.  I know that when we discussed it a while

16  ago in the context of whether there would be discovery on the

17  attorney's fees portion, I had had a conversation with Judge

18  Arleo, and she had suggested and I think I passed it on to

19  you-all, that you consent to magistrate judge jurisdiction

20  because it just concerned fees.

21        You know, some cases treat this kind of motion as

22  dispositive, and others don't.

23        Do you have -- do you care?  Do you have an opinion

24  on it?  Should I issue a report and recommendation?  Or

25  should it be my opinion, and then if you have a problem with

 1   it, you appeal to the Third Circuit and not Judge Arleo.

 2           MS. TOWNSEND:  I think our expectation, actually,

 3   was that it would be a report and recommendation to Judge

 4   Arleo.

 5           THE COURT:  Okay.

 6           MS. TOWNSEND:  That's what we were anticipating.

 7           THE COURT:  Right.

 8           MS. TOWNSEND:  That being said, I think, again,

 9   this is been long-running enough, that I don't think the

10   delay in terms of an appeal would make all that much of a

11   difference to us, as plaintiffs.

12           THE COURT:  Okay.

13           MS. TOWNSEND:  And I also --

14           THE COURT:  But you were assuming an R & R.

15           MS. TOWNSEND:  I was assuming that, Your Honor.

16           THE COURT:  Okay.  Got you.  That's good enough.

17           Thank you very much.

18           MS. TOWNSEND:  Thank you.

19           THE COURT:  Mr. Potters.

20           MR. POTTERS:  Do you mind if I stand here, Judge?

21           THE COURT:  Not at all.

22           MR. POTTERS:  Because I have got a lot of paper.

23           THE COURT:  I see that.

24           MR. POTTERS:  I don't think I'm going to need much

25   of it.

1          Let me work backwards, though, before I get to my

2     arguments, if I may.  In terms of the stipulated facts, the

3     stipulated facts are necessary, because plaintiff, in the

4     argument that we heard here today and also in the briefs on

5     this motion, refuses to accept what occurred with regard to

6     the role of the FBI in this action.  Plaintiff continues to

7     state "NJIT contends."  "NJIT submits."

8          The reason why we did the stipulated facts is to

9     put any of those issues to bed.  And we heard it earlier

10    during the argument of counsel in response to a question on

11    the issue of duty where plaintiffs' counsel said that the

12    NJIT -- NJIT needs to be satisfied that what the FBI was

13    doing comports with OPRA, and plaintiffs' counsel said, the

14    documents were reviewed by somebody.

15         That's the best evidence of why we prepared the

16    stipulated facts, to make clear NJIT did not review the

17    documents.  That's one point.

18         Another point --

19         THE COURT:  It collected the documents.

20         MR. POTTERS:  NJIT assembled the documents, and

21    then based on the monikers, reached out to the FBI and said

22    these are pretty much your documents.  What do you want us to

23    do with them?

24         THE COURT:  Should NJIT have reviewed the documents

25    and made an independent call?

1                MR. POTTERS:  Absolutely not.

2                THE COURT:  Why not?

3                MR. POTTERS:  The best evidence of that, Judge, is

4   based on the facts of what occurred here.  After the

5   documents were assembled, the FBI conducted its review over

6   a -- period, provided direction to NJIT with regard to the

7   exemptions.  The letter was then produced May 27th, 2015, to

8   the plaintiff directing the plaintiff to issue a FOIA

9   request.  And the litigation was filed.

10               We had to reassemble the documents.  Okay?  Because

11  the documents were -- were entrusted to the FBI, and we

12  needed to create a new set because there was a new team at

13  the FBI through the Department of Justice that was going to

14  review the documents.

15               So Your Honor's question is shouldn't have NJIT

16  have reviewed the documents?  We assemble- -- we reassembled

17  those documents, which was no small feat and no small amount

18  of fees to my client, and the records reflect that general

19  counsel at NJIT, Holly Stern [phonetic], is here.

20               What happened then is we made those doc- --

21  reassembled documents available to an FBI representative,

22  John Genoble [phonetic], in our conference room.  And we

23  said, Can we copy these?

24               Answer:  No.

25               Could we send these out to be re-produced by a copy

1    service?  We'll get it back in two hours.

2              Answer:  No.

3              Can we Bates-stamped documents, because at some

4    point, we anticipated that, based on the litigation, there

5    would need to be the OPRA index, and you'd need to refer to a

6    document by Bates stamp.

7              Answer:  No.

8              So whether or not NJIT even had a desire to review

9    the documents substantively, its hands were tied.

10             THE COURT:  But was that the FBI's right to tell

11   you, as records custodian, that you couldn't -- you couldn't

12   review the documents, you couldn't make calls under OPRA, and

13   then putting you in what you've characterized as the Hobson's

14   choice of being subject to their review and maybe having to

15   pay fees?

16             MR. POTTERS:  It certainly presents an issue.  But

17   I think this is the exact issue that the Gannett decision

18   anticipated.  And there's one thing that I do agree with

19   plaintiff completely is there is no law on this.  This is a

20   unique issue.

21             But as Gannett makes clear -- and I'm quoting 379

22   N.J. Super. 205 at page 214, quote, "The party with the

23   interest in maintaining the confidentiality of investigatory

24   materials and the capacity to explain the need for that

25   confidentiality is the investigatory agency, here, the United

1   States Attorney's Office, rather than the party in possession

2   of the materials."  Quote closed.

3           THE COURT:  Right.  And then -- you know, it --

4   that calls to mind -- I'm sorry to interrupt you.  But it

5   calls to mind, I think it was in Spectraserve that in a

6   similar situation -- and forget whether it was a party who

7   requested it or the court that *sua sponte* ordered it, said to

8   the third party, you're required to intervene to assert your

9   third-party interest or forever hold your peace and deem it

10  waived.

11          I mean, that didn't happen here.  Could it have?

12          MR. POTTERS:  And let's talk about that, because

13  counsel had referenced that.  And that is replete throughout

14  the JSRs, the joint status reports.  The argument previously

15  interposed by plaintiffs was, hey, the FBI had an opportunity

16  to intervene, it chose not to.  Therefore, the FBI takes no

17  position.

18          Now, how unsquare is that with the pleading filed

19  by the FBI that seeks both declaratory and injunctive relief

20  against NJIT is lost on me.

21          So there was no abandonment.  And, in fact, a new

22  team was put on the field, new U.S. attorney, and a gentleman

23  from the Department of Justice in Washington.

24          THE COURT:  So -- but to be fair, the FBI didn't

25  intervene, even though it wasn't anticipated they would in

1   the state court, but when NJIT then impleaded the FBI, they

2   asserted --

3           MR. POTTERS:  Correct.

4           THE COURT:  -- they sought to enjoin NJIT from

5   producing the records.

6           MR. POTTERS:  Yes.  And to supplement that, so the

7   record's clear, John Genoble, the Newark office of the FBI,

8   is the one who asked me to secure the extension from

9   plaintiffs' counsel.  Please get an extension of time.  We're

10  going to intervene.  Essentially, relax.

11          And I didn't speak to Ms. Townsend.  I spoke to her

12  local counsel, Ms. -- Bruce Rosen and communicated that to

13  him.  That statement by plaintiffs' counsel's a hundred

14  percent correct.  That's exactly what happened.

15          I don't know why they didn't intervene.  I was

16  told -- it was suggested to me that there's a process by

17  which intervention occurs.  As Your Honor is well aware from

18  the joint status reports, some of the issues between the FBI

19  and NJIT are intellectually esoteric, to it mildly.

20          But -- but I say that somewhat humorously, but I go

21  back to a point that counsel made:  Fees on fees.  So much of

22  the time that was spent by plaintiffs' counsel was to prevent

23  NJIT from doing what it suggested at one point it may do,

24  which was to dismiss the claim against the FBI, go back to

25  state court and have Judge Mitterhoff adjudicate the case.

1    There's -- there's at least two or three JSRs on that, and

2    there's extensive submissions to Your Honor on that, in

3    particular, as to how the Court retains jurisdiction.  Those

4    are pretty heady issues that, honestly, I haven't dealt with

5    since law school.

6            So it's not fees on fees.  It's fees designed to

7    keep this in a forum that they believed was somehow more

8    desirable than returning back to Judge Mitterhoff.

9            Another point --

10           THE COURT:  I guess I should take that as a

11   compliment.

12           MR. POTTERS:  I find it interesting that Mr. Golden

13   made FOIA requests to other public entities.  And I'll just

14   leave that alone for now.

15           The -- the statement by plaintiffs' counsel that

16   after the third OPRA request was responded to by NJIT, that

17   plaintiff had no choice but to walk away or litigate, is not

18   complete.  Plaintiff had an opportunity to issue a FOIA

19   request.  And he did not.

20           THE COURT:  But he's not required to, either.

21   Right?

22           MR. POTTERS:  He's not required to.

23           But let's talk about that.  Under the state court

24   practice, when the verified complaint and the order to show

25   cause are filed, then we appeared before Judge Mitterhoff on

1    the return date, that was the exact question that Judge

2    Mitterhoff put to plaintiffs' counsel.  And in the order that

3    was entered by Judge Mitterhoff -- and that order was the

4    subject of, shall we say, voluminous exchanges between

5    counsel.  In the first paragraph, quote, under paragraph B,

6    quote:  The Court's -- recognition of defendant NJIT's

7    compliance with the written direction of the FBI to not

8    produce certain documents.

9                I went to stand up, and one of those proverbial,

10   Sit down.

11               And then the question was put to plaintiffs'

12   counsel -- here's the May 27, 2015, letter -- Why didn't you

13   issue a FOIA request?

14               To answer Your Honor's question, there has been

15   absolutely zero change in NJIT's position throughout.  Zero

16   change.

17               THE COURT:  Walk me through it with respect to the

18   exemptions, because the -- we have to put a fine point on it

19   there.  Did NJIT -- well, first of all, did NJIT withhold

20   any -- withhold any documents on the basis of exemptions it

21   was asserting on its own behalf?

22               MR. POTTERS:  The answer is no.  NJIT did not

23   withhold any documents on its on behalf.  NJIT did not redact

24   any documents on its own behalf.  NJIT made zero redactions.

25   NJIT had zero substantive involvement in what documents to

1   withhold and ultimately the decision to withhold documents.

2          At -- and that's why the stipulation is so

3   critically important and the actual facts do matter.  When

4   those documents were assembled and the FBI folks came to the

5   NJIT conference room, the door was shut, and it was

6   essentially, "We got it from here."  NJIT did not participate

7   in the review; did not participate in substantive,

8   deliberative analysis of the documents; did not make any

9   redactions; did not make any decisions with regard to

10  withholding documents.

11         Rather, the FBI -- rather, the FBI did all of that.

12  And NJIT relied on the lawful direction provided to it by the

13  FBI.

14         THE COURT:  Why was it the lawful direction?  I

15  mean, it seems obvious, because we live in a world where the

16  FBI tells you to do something, you do it.  But -- but what

17  was the actual authority pursuant to which they could direct

18  you not to respond independently to the OPRA request?

19         MR. POTTERS:  In preparing for the oral argument, I

20  actually went back and was rereading all of our responses,

21  NJIT's responses.  And I refer to one of the responses on

22  April 8th, 2015, and in answer to Your Honor's question, what

23  authority, what NJIT did is it quoted from the monikers that

24  were on the documents.  So under exemptions -- and I'm

25  quoting -- please be advised that emails, paren, 3,696 pages,

1    close paren, from the FBI that have one of the following

2    statements written on them, quote, this document, comma, or

3    any segment, thereof, comma, may not be rewritten, comma,

4    posted on the Internet, comma, or given to any other public

5    or private entity without prior written or verbal approval

6    from the Federal Bureau of Investigation.  Period.  Quote

7    closed.  Or, period, quote, publication of reproduction

8    prohibited, slash, initial cap unclassified, period.  Quote,

9    closed.  Or, comma, quote, this document is, initial cap,

10   unclassified, slash, initial caps, for official use only,

11   period.  Quote closed.  Or, comma -- or, quote, rather, this

12   document is for, initial caps, official use only and is not

13   to be posted on external website and limited internal

14   distribution to those who have a need to know.  Period,

15   closed quote.

16        THE COURT:  So that -- that was the authority that

17   you understood they were acting under, even if they were

18   helping themselves to, you know, a protective order or

19   confidentiality order that was unilaterally imposed, you

20   still understood it to be -- have the force of law.

21        MR. POTTERS:  World's premier law enforcement

22   agency, NJIT is in communication with the FBI, sometimes on a

23   daily basis.  There were a number of foreign students.  We

24   live in a post-9/11 world.  There are all kinds of issues

25   with regard to security, with regard to work with the defense

 1   department, which is exactly what Mr. Golden's book was

 2   about.

 3          Support the book, by the way, haven't read it, but

 4   great idea, great concept, what's relationship between

 5   universities and our government.  No issue with that.  And

 6   I'm glad that somebody's shedding light on it.

 7          But what is -- what is NJIT supposed to do?

 8          THE COURT:  Well, I think the answer may be defy

 9   the FBI.

10          MR. POTTERS:  And certainly that's what plaintiff

11   suggests, and --

12          THE COURT:  And that's -- yeah.  And that's a

13   difficult -- you know, I'm concerned -- and this is more for

14   Ms. Townsend -- I'm concerned about reporters' rights of

15   access.

16          But I'm also concerned about setting a precedent

17   that says, oh, you get an OPRA request, and the FBI or CIA

18   tells you, don't you dare, and the -- and what you have to do

19   is defy them in order to not be assessed fees.  That's

20   difficult.

21          Go ahead.  Yeah, why don't you --

22          MS. TOWNSEND:  Can I address that, Your Honor?

23   Because I think -- the problem with Mr. Potter's position is

24   that the authority that he's citing, which are these sort of

25   stands on "documents for official use.  Don't -- don't

1    disseminate it."  That's not authority.  It's a different

2    scenario, if you're talking about the situation in Gannett,

3    which involved, I believe --

4            THE COURT:  That's not authority.  That comes from

5    the FBI.  It's not like the town municipal pool says, do not

6    reproduce this.  It's --

7            MS. TOWNSEND:  No, I think it's -- it's not -- it's

8    not an OPRA exemption.  So it's a different scenario --

9            THE COURT:  Well, it could be an OPRA exemption.

10   Right?

11           MS. TOWNSEND:  It could possible- -- the document

12   that is stamped that, could potentially be subject to an OPRA

13   exemption.

14           THE COURT:  It's a flag that it might be subject to

15   a national security interest, which is an OPRA exemption.

16           MS. TOWNSEND:  And maybe that's -- that's true.

17   But I think it's --

18           THE COURT:  Well, if it's terrorism-related.

19           MS. TOWNSEND:  But I think it's not okay for NJIT

20   to say, well, it's stamped "do not disseminate," so it's

21   exempt from disclosure under OPRA.  That's essentially what

22   NJIT's position is.

23           In Gannett, when we're talking about --

24           THE COURT:  But that isn't what they did.  They

25   said, so we have to let FBI take a look at them.  Right?

1          MS. TOWNSEND:  And, again, I think consulting with

2   the FBI concerning whether or not these specific documents

3   that maybe were stamped, "Don't disseminate these, not for

4   public dissemination, don't post these on the Internet, don't

5   distribute them to the media," NJIT seized that.  They

6   asked -- they would, I think, ask the FBI, is this exempt

7   under -- from disclosure under OPRA?

8          I think that's the question that needs to be asked.

9   And I think that's the question that was never asked.  I

10  think, in fact, that's what NJIT is saying.  We took no role

11  whatsoever in any of this.  And unfortunately, for

12  Mr. Potter's -- that's actually not allowed under New Jersey

13  law.  They're custodian of the records.  They're responsible

14  for -- for addressing this.

15         And I think some of the cases that we cite to in

16  our -- in our briefing, Courier News, for example, which is

17  not even addressed or distinguished in NJIT's brief, and also

18  albeit an unpublished decision, I think it's helpful.  Path,

19  another Path case, the other one --

20         THE COURT:  He was quite litigious.

21         MS. TOWNSEND:  He was.  He's a frequent requester,

22  I guess we would say.  West -- township --

23         THE COURT:  Like Ms. Mason.

24         MS. TOWNSEND:  Or also like Ms. Mason.

25         West -- Township is a case in which there was an

1   actual order -- I mean at least in that case, there was a

2   protective order.  Granted, it was a stipulated discovery

3   protective order.  And the court even found that wasn't

4   sufficient.

5            And, here, we don't even have that.  Basically what

6   we have is an informal --

7            THE COURT:  Okay.

8            MS. TOWNSEND:  -- admonition from the FBI.

9            THE COURT:  All right.  I don't want to

10  interrupt -- I'll give you another chance, but --

11           MS. TOWNSEND:  I understand.  I understand.

12           THE COURT:  But, thank you.

13           Mr. Potter, please continue.

14           MR. POTTERS:  I'm going to get to that custodian

15  issue in a moment, but let's just not forget that, because I

16  think that's a critical point.

17           Just so we're clear, if this was a moniker from the

18  office of the governor, there is already provision under New

19  Jersey state law that what NJIT was proper.  There's an

20  executive order -- that was --

21           THE COURT:  Well, that's a specific exemption.

22  Righted.

23           MR. POTTERS:  Exactly.  That was issued by

24  then-Governor McGreevey in 2002, Executive Order Number 21.

25           And here, that doesn't exist for the FBI.  And I

1   think Your Honor is striking the nail in the center of the

2   head when Your Honor distinguishes this -- for whatever

3   reason, I keep saying the Sussex County municipal utilities

4   authority, but you can say the town pool.

5           THE COURT:  Middlesex.

6           MR. POTTERS:  There is -- there's a difference

7   between that and the Federal Bureau of Investigation.

8           Let's -- let's step back, though, for a minute.

9   Why are fees awarded under OPRA?

10          Fees are awarded under OPRA because it serves as a

11  strong deterrent against withholding documents or asserting

12  exemptions nakedly and for nonmeritorious reasons.  That's

13  why the statute, prescriptive as it is, is worded the way it

14  is.  And it is a strong statute.

15          And like the sunshine law which preceded it, it

16  favors disclosure.  Favors --

17          THE COURT:  Government records counsel's

18  instructions say that.

19          MR. POTTERS:  Absolutely.

20          THE COURT:  Exclamation point.  Err on the side of

21  disclosure.

22          MR. POTTERS:  Exactly.  And it all derives from the

23  sunshine law.

24          And the overriding purpose in both the sunshine law

25  and OPRA is so that the functioning of government is

1   transparent so that all of the backroom dealing, wheeling,

2   dealing is now out in the open.

3          And I submit that's a salutary purpose of

4   legislation.

5          And I'd also submit that the fee provision to work

6   a strong deterrent, makes sense with that salutary purpose.

7          But upfront, what's the question?  In evaluating

8   the conduct of NJIT here, based on the actual facts, did NJIT

9   act in any manner whatsoever without transparency?  Did NJ

10  act at any time without nonmeritorious reasons?

11         NJIT made a full disclosure and complete disclosure

12  of the constraints that were imposed upon it, based on (A)

13  the confidential moniker that appears on the documents; (B)

14  the letter from the FBI that was provided, and I understand

15  there was a second letter that was sent to the deputy general

16  counsel of NJIT, similar effect, that's the May 27th, 2015,

17  letter; and (C) the Department of Justice claims on behalf of

18  the FBI for injunctive and declaratory relief prevents NJIT

19  from making the very unilateral decision that plaintiff seeks

20  to impose upon NJIT.

21         There's no choice.  Once the FBI was involved and

22  it shut the door and said, "We have it from here," we're

23  done.  There is no duty.  There is no obligation.  There is

24  nothing else that we can do under these facts.  Again, if it

25  was the Middlesex County pool authority, that's different.

1    But when it's the FBI and we live in a post-9/11 --

2              THE COURT:  I said in the Middlesex County because

3    I thought you were talking about <u>Spectraserve</u>.

4              MR. POTTERS:  There you go.  Thank you.

5              Now, in terms of the actual facts here, it's

6    undisputed that plaintiffs know before the lawsuit was filed

7    and before they incurred dollar one in attorney's fees, that

8    NJIT has no choice once the FBI asserted control over the

9    documents.  And if you go back, as I did, and reread all of

10   the joint status reports from Joint Status Report Number 1,

11   that's where, respectfully, we have this language NJIT

12   contends, NJIT suggests, as if somehow I'm writing something

13   as if it's an argument as opposed to a statement of fact.

14   That's why we got the statement of facts.

15             It also --

16             THE COURT:  Well, I think -- I think maybe the

17   difference between your positions is not that -- and I'll ask

18   Ms. Townsend on rebuttal to comment on this -- is not so much

19   that plaintiffs are saying that the FBI didn't tell you that,

20   but that you -- you had more of a free choice than you

21   perceived and, indeed, were required to act under the law.  I

22   think that's the difference.

23             MR. POTTERS:  I'm going to come back to that.

24             THE COURT:  Okay.

25             MR. POTTERS:  I'm going to come back to custodian,

1   and I'm going to come back to choice.  I promise.

2            It bears repeating -- and it's of critical

3   importance that most of these documents were actually FBI

4   documents.  And that bears on the custodian issue.  Most of

5   the documents had monikers on them advising the recipient

6   NJIT and then directing the recipient.  It was not presented

7   as a normative proposition:  You ought to consider not

8   releasing this.

9            It was stated:  Thou shall not produce these

10  documents.

11           So there was no discretion on the part of NJIT.

12           And I think that's really the essence of this

13  dispute where on page 2 of plaintiffs' reply brief, plaintiff

14  states NJIT relied on, quote, direction, quote closed, of

15  FBI.

16           And, again, the word "direction" is put in quotes

17  as if somehow NJIT had some discretion.

18           You can't ignore the direction of the FBI saying

19  these are FBI documents.  If you want them, file a FOIA

20  request.  Ignore that.  Then file an OPRA lawsuit.  Then have

21  the entity against whom the suit is filed say, see the FBI

22  letter, file a FOIA request, and then be heard to complain

23  about fees incurred under OPRA.

24           And that's really what this case is all about.  And

25  let's look at it in the context of the OPRA fee calculus,

1   which is presented by plaintiff -- and I have no dispute with

2   this.  You have a request for records.  You have a denial of

3   those records.  You have a lawsuit that's then filed.  After

4   the lawsuit's filed, records are produced.  And then you get

5   fees.

6           I don't dispute that that is what so much of the

7   case law says.

8           But let's talk about these facts under that OPRA

9   calculus.  And let's first talk about the request and the

10  denial.  Who made the denial?  NJIT didn't make the denial.

11  The FBI made the redactions.  The FBI withheld documents from

12  production, and plaintiff knew that before the lawsuit was

13  filed.  It was not NJIT.

14          Before the lawsuit was filed, the plaintiff knew

15  that NJIT did not control the documents; that NJIT did not

16  control the documents because the FBI had asserted control

17  over them by providing NJIT with direction over what was to

18  be produced; and plaintiffs knew all this based on the

19  May 27th, 2015, correspondence.  So this lawsuit was

20  completely unnecessary in terms of obtaining release of these

21  records.

22          THE COURT:  They didn't file it, and if it weren't

23  removed here, I wouldn't have badgered the FBI to keep

24  releasing records and reviewing them more quickly, frankly.

25          MR. POTTERS:  And --

1          THE COURT:  Because that was a bit of a process.

2  They wanted to go slowly.

3          MR. POTTERS:  And that's correct, it was 500 pages

4  over X amount of months, and then there were, I think, a

5  total of eight productions.

6          But that goes back to the comment I made before

7  about the return date on the order to show cause.  Before we

8  even came before Your Honor, question was put directly:  Why

9  didn't you file a FOIA request?  And similarly, why don't you

10  file a FOIA request?

11          We don't understand why the plaintiff never issued

12  that FOIA request.  And maybe it was a strategic move at the

13  time.  I am not suggesting for one moment that this lawsuit

14  was filed so that it could trigger on award of fees.  That's

15  not my point when I say strategic purpose.

16          It could be substantively that the fee provision

17  under FOIA is different than the fee provision under OPRA.

18  And it's a higher standard under FOIA to get fees than it is

19  here under OPRA.

20          Now, I won't go through the FOIA criteria.  If

21  Your Honor wants me to, I can.

22          THE COURT:  No.  That's okay.

23          MR. POTTERS:  But it is a different standard.

24          THE COURT:  They weren't required to do it.  They

25  didn't do it.  That's un -- both of those are undisputed.

1            MR. POTTERS:  But -- but last point on that is if

2    there is a rejection of the stipulated facts, my position's:

3    No problem.  Let me take the plaintiff's position and ask

4    him, why didn't you file a FOIA request?

5            But I don't think we're going there.

6            Let's talk about the next stage: the denial of

7    records and then the filing of the lawsuit.  Who do the

8    plaintiffs sue?  Or put better, who did the plaintiff not

9    sue?  Though plaintiffs possessed of knowledge who -- as to

10   who was essentially the, quote, *de facto* custodian of the

11   records.  Just because you're in possession of the records,

12   doesn't mean you're the custodian.  The monikers on the

13   documents, number one, with the letters written by the FBI to

14   NJIT, the May 27th, 2015, letter, which was provided to

15   Mr. Golden, and the second request -- was provided to

16   counsel, once they got in the case, made clear that NJIT did

17   not control the documents.

18           THE COURT:  But they couldn't file -- they couldn't

19   sue the FBI under OPRA.  Right?

20           MR. POTTERS:  No.  But they could have issued a

21   FOIA request then.

22           THE COURT:  Right.  So -- but that would have --

23   the serving of the FOIA request would have been -- had to be

24   a condition precedent to suing the FBI.

25           MR. POTTERS:  Exactly.  Exactly.  And that was

1   already --

2           THE COURT:  And then they would have had to sue the

3   FBI in federal court.  Right?

4           MR. POTTERS:  That would have been over two years

5   ago, yes.

6           And it -- I would respectfully submit, not that I

7   have a crystal ball, I think it would have gone a lot faster,

8   but that's just speculation on my part.

9           THE COURT:  Well, you know, it did take a while

10  here, but I'm not going to apologize for the Court, because

11  what the Court did, frankly, avoided a lot of litigation and

12  motion practice.  No.  I'm saying to both parties on behalf

13  of the Court, that there's a lot of J -- you know, this -- we

14  never envisioned it would take two and a half years, but nor

15  did the parties have to acquiesce to the process suggested by

16  the Court that turned over thousands of documents to

17  Mr. Golden.

18          So -- and it took time for the FBI to review.

19          So anyway, to the extent delays are -- are

20  referenced, I have to stand up for the Court.  I'm not

21  apologizing to any party for the length of time it's taken,

22  because everyone was completely compliant in what was

23  suggested.

24          MR. POTTERS:  Judge, perhaps I misspoke.  I wasn't

25  suggesting --

1            THE COURT:  No.  I wasn't even directing it to you.

2    Just the specter that's been raised during these arguments.

3            MR. POTTERS:  No, and I want to be clear on that

4    point, because it's -- it's an important point.  I'm not

5    suggesting that the Court delayed it.  I'm suggesting that

6    the time period from the appearance before Judge Mitterhoff

7    until ultimately there was a resolution by way of the FBI or

8    the Department of Justice rereviewing the documents and

9    releasing them, would have been compacted --

10           THE COURT:  Yes.

11           MR. POTTERS:  -- if we were not here.

12           THE COURT:  Yes, and I wasn't -- I wasn't inferring

13   that you were saying that.

14           But, obviously, if an adjudication was required, it

15   would have happened a lot sooner, whether in state court or

16   here.

17           MR. POTTERS:  So at the time that there were

18   virtually no attorney's fees incurred by the plaintiff, where

19   now, before Judge Mitterhoff on the return date of the order

20   to show cause, the FBI did not intervene.  We filed an

21   answer.  We filed a counterclaim -- I'm sorry.  We filed --

22   we did file a counterclaim.  And we filed a third-party

23   complaint seeking defense and indemnification from the FBI.

24           And so the questions that Your Honor had put to me

25   and to counsel earlier in terms of, well, on what basis did

1   NJI rely on the direction provided by the FBI?  Could NJIT

2   have conducted a review? those questions are answered

3   directly without any equivocation once the FBI filed its

4   answer to NJIT's counterclaim.  Unless there be any doubt, to

5   the extent there was any discretion -- and if the Court finds

6   that NJIT had any discretion up until that point, once the

7   counterclaim is filed seeking declaratory and injunctive

8   relief against NJIT from doing that which plaintiff would

9   have had us do, NJIT's hands at that point in time are most

10  certainly tied and constrained by the FBI.

11          And that's where the facts, again, matter, because

12  that's the point in time where we had reassembled the

13  documents, and they were on the table in my conference room,

14  as I noted earlier.  And even if we wanted to at that point

15  in time say to the plaintiff, here's the documents, come to

16  my conference room, take a look at it, we couldn't, because

17  there's now a counterclaim for declaratory injunctive relief

18  against us.

19          And even at that point in time, plaintiff never --

20  knowing that the FBI at that -- at that point in time,

21  plaintiff clearly knew that FBI was in control of the

22  documents, because they're telling us, thou shall not produce

23  the documents, lest we get an injunction against you, lest we

24  get a declaratory relief levied against you.

25          And even then, very early on, with only nominal

1   amount of fees incurred, plaintiff didn't issue a FOIA

2   request.  What that establishes is that the FBI had complete

3   control over the documents assembled by NJIT.  Period.  End

4   of story.  No semicolon.  No but.  No however.  Period.

5          FBI was the custodian of these records at the

6   moment in time that counterclaim was filed.

7          THE COURT:  Wait a second, because, you know, we

8   always go to the definition, under the statute, which

9   47:1A-1.1, defines custodian as that official designated by a

10  public agency to respond to requests as to which the agency

11  has custody or control -- in the disjunctive.  And I suppose,

12  technically, because the information still resided on NJIT's

13  servers, if the FBI didn't require them to delete it, they

14  still had custody, if not control.

15         MR. POTTERS:  Well, they certainly had possession.

16  And I would submit most certainly, they did not have control.

17         THE COURT:  Right.  Control is what you seem to be

18  focusing on.

19         MR. POTTERS:  Correct.  And --

20         THE COURT:  I think there were two custodians here.

21         MR. POTTERS:  There -- there arguably could be two

22  custodians, but when the world's premier law enforcement

23  agency is giving you direction, with all due respect, you're

24  no longer the custodian for purposes of OPRA.

25         Almost done, Judge.  Just a few more points.

1           THE COURT:  Yeah, that's fine.

2           Can I ask you a miscellaneous question?

3           MR. POTTERS:  Sure.

4           THE COURT:  There were certain domains that

5   Mr. Golden wanted that related to the CIA.  And then I saw in

6   one of the early letters, one of the May letters back from

7   NJIT that the answer to the CIA request was "none."

8           MR. POTTERS:  Correct.

9           THE COURT:  There -- okay.  So it was "none," not

10  "the FBI's reviewing CIA information as well."

11          MR. POTTERS:  There were no documents assembled --

12          THE COURT:  Okay.

13          MR. POTTERS:  -- in response to the OPRA request

14  that related to that request.

15          THE COURT:  From the CIA.  Okay.

16          And do you agree this is an R & R to Judge Arleo?

17          MR. POTTERS:  I think that's the way it is.  And

18  we're completely satisfied with that.

19          THE COURT:  Okay.

20          MR. POTTERS:  Now, just few of more points.

21          What plaintiff argues is that NJIT, after this

22  counterclaim is -- after the answer to the counterclaim is

23  filed, based on the joint status reports that are before the

24  Court and in the brief in here, plaintiff argues, it doesn't

25  matter.  You still, NJIT, had this obligation.

1       And I just -- the argument is lost on me.

2       THE COURT:  Well, that's where the two sides

3   diverge.  I'm not surprised.

4       MR. POTTERS:  Yes.  And -- but what they don't do

5   is they don't cite any law to support that position.  An.

6       D the law that does exist, albeit dicta in the

7   Gannett decision -- or the Gannett decision -- supports this

8   position, number one.  Number two, under then-governor

9   McGreevey's executive order, they recognized this issue.  Why

10  they haven't amended it to make it apply, I don't know.

11  There's no -- what we do agree on is there is no case similar

12  to this in the United States.

13      THE COURT:  Well, thanks a lot.

14      MR. POTTERS:  In terms of --

15      (Laughter)

16      MR. POTTERS:  -- in terms of state statutes that

17  mandate disclosure.  It's surprising that under OPRA and

18  right of access statutes throughout the country, that this

19  issue has not yet arisen, but it arises here.

20      Now, last two points, now we're at the suit

21  production stage.  Okay?  We had the request.  We had the

22  denial.  Now we have the lawsuit and the production.

23      Who did the rereview of the documents?  Not NJIT.

24  And Your Honor made this point earlier, so I don't think I

25  need to go through it point by point.  The fact is NJIT had

1   no substantive involvement in lifting any of the redactions

2   and ultimately releasing any of the documents for production.

3   NJIT was simply a courier.

4            THE COURT:  I think that's shown by the letters,

5   which enclose the disks and the underlying correspondence

6   from the FBI wherein NJIT says, here's this information the

7   FBI is letting us send you.

8            MR. POTTERS:  Now, despite those facts, that NJIT

9   was not involved in that rereview, the argument that's

10  presented on this fee application in both plaintiffs' moving

11  brief and in their reply to our opposition is just to restate

12  the simple OPRA calculus: request, denial, suit, production,

13  fees.

14           And the facts here clearly demonstrate that this is

15  anything but simple.  It's not a garden-variety OPRA case --

16           THE COURT:  Look at, it comes down to one thing,

17  doesn't it?  Factual causal nexus.

18           MR. POTTERS:  That's exactly right.  And here, I

19  think --

20           THE COURT:  I don't think you're arguing that they

21  didn't have a substantive underlying right, that they -- to

22  the records.  I don't see that in any of the briefs.  I think

23  it's on the nexus.  Right?

24           MR. POTTERS:  I think the way I characterize it is

25  that the actions, whether you do not -- whether you choose to

1  reject my argument that the FBI is a *de facto* records

2  custodian --

3          THE COURT:  Right.  Putting that aside --

4          MR. POTTERS:  -- I think there's a number of --

5          THE COURT:  -- but I -- I'm not -- I'm not that

6  enamored of that at this point.

7          MR. POTTERS:  But there's another way to present

8  that, that the actions of the FBI constitute a superseding

9  intervening -- that relieves NJIT or discharges it of what

10  would otherwise be its duty under OPRA.

11          And I think that is not being clever --

12          THE COURT:  I'm not sure we can import that body of

13  law into OPRA, but I appreciate your argument.

14          MR. POTTERS:  So let me return to the question that

15  I put at the outset:  Why are fees awarded under the OPRA

16  statute?

17          And one thing any good lawyer does and any good

18  client does that's involved substantively in the processes,

19  they look back at what occurred, and they say what could we

20  do differently, if this issue arose in the future?

21          I guess one thing NJIT could do is it could say to

22  the FBI, these documents have a moniker on them, you can take

23  a look at them.  But here's a defense and indemnity agreement

24  I want you to sign before you look at them.  Now, that's not

25  going to work, obviously.

1          THE COURT:  Well, I think Ms. Townsend would say,

2    do what Florida state did.

3          MR. POTTERS:  I don't think you can do what Florida

4    state did.  And I don't think the Florida state is remotely

5    analogous to what occurred here.

6          THE COURT:  I couldn't get a good handle on it.  I

7    read the letter from Florida state.  There's a lot of

8    discussion about a particular gentleman and -- so it's

9    difficult.  And I hear that -- NJIT's argument that it's a

10   different state law and so forth.

11         MR. POTTERS:  And I also think it's hearsay,

12   because it's not properly before the Court.  But let's put

13   that to the side.

14         At the end of the day, if this case arose tomorrow,

15   NJIT would do absolutely nothing different.  It would do

16   exactly what it did here:  Pick up the phone, deal with the

17   contact at the FBI that they deal with on an almost daily

18   basis on a multitude of security issues.  And it would say,

19   we have a request here.  We've assembled the documents.

20   There's FBI monikers on these documents.  What do you want us

21   to do?

22         I think that goes to show the reasonableness of

23   what NJIT did, the lack of any lack of transparency with what

24   NJIT did, and the fact that all of this was disclosed to

25   plaintiff.  Nothing was hidden from plaintiff.  It's not as

 1   if NJIT said, we're -- we're giving you these documents.

 2   There's redactions.  Lots of documents are withheld.  Don't

 3   talk to us.

 4            They were very transparent with what they did.  And

 5   I don't think they could have done anything differently.

 6   There's no knowing or willful violation in any way, shape, or

 7   form that justifies any award of attorney's fees here against

 8   NJIT.

 9            Thank you, Judge.

10            THE COURT:  Thank you.

11            Ms. Townsend?

12            MS. TOWNSEND:  Thank you, Your Honor.  I'll try to

13   keep it brief.

14            I did want to address a couple of things that

15   counsel for NJIT raised in his argument.  I would just as a

16   factual matter sort of take issue with the idea that

17   plaintiffs -- well, first I'll start by saying, I don't think

18   we're -- we're not critical of the Court in terms of the time

19   it spent to resolve this.  In fact, I think -- I meant what I

20   said when -- I think it's beneficial when parties can get

21   together and talk about withholdings and try to narrow -- at

22   a minimum, narrow the scope of issues that they're going to

23   present to the Court.  I think that was effectively done

24   here.

25            I think in terms of it -- did we anticipate the

1  sort of ins and outs of all of this?  And did my client

2  anticipate the ins and outs in all of this when he made an

3  OPRA request to NJIT?  He frankly did not.  And I think I was

4  responding to your question concerning -- which was a

5  question that Judge Mitterhoff also asked:  Why didn't you

6  submit a FOIA request?  I think that's a fair question.  And

7  I think I've responded to what I think our expectation was

8  that, generally speaking, public records -- or my clients'

9  expectation was that, generally speaking, public records

10  requests, the state entities under state law are resolved

11  more quickly.

12          Maybe that's not the case here.  We're not

13  complaining about that.  But I think that that sort of

14  explanation --

15          THE COURT:  Right.

16          MS. TOWNSEND:  -- of what we were thinking at the

17  time.

18          THE COURT:  Right.  But it's not an election.  It's

19  not either/or.  You can do both.

20          MS. TOWNSEND:  And it's both in many cases and, in

21  fact, most cases.  And there were -- it wasn't just -- I

22  can't recall if it was Florida state, it might have been the

23  University of South Florida that we attached the letter

24  from --

25          THE COURT:  Yeah, I may have misspoken that.

1          MS. TOWNSEND:  I think that's right.  But

2  Mr. Golden, in his declaration that he submitted in

3  connection with his motion, the motion for attorney's fees,

4  indicated that, in fact, he made a -- his book is lengthy.

5  He made a number of similar requests.  So it wasn't just that

6  university.  It was the University of Illinois, University of

7  Florida, University of California-Davis, I believe.  So

8  there's a number that he lists -- Arizona, I also believe,

9  responded to this similar requests for the same essentially

10  communications.

11          I would note that -- I do take issue with the idea

12  that plaintiffs sort of extend the briefing schedule by

13  attempting to keep this case in this court.  I think our

14  concern -- and I thought it was clear, based on the

15  discussions that we had before Your Honor, that our concern

16  was just getting this resolved as quickly as possible.  In

17  fact, we wanted to minimize briefing, and we wanted to

18  minimize sort of back and forth.

19          So we were -- and we also wanted to minimize the

20  possibility that we would end up in a sort of -- a situation

21  like what occurred in Courier News, which I think ultimately

22  came out well, but it as well resulted in sort of a remand

23  and then additional briefing on which parties were

24  responsible.  We were obviously, concerned, as plaintiffs,

25  that if the FBI was permitted to be dismissed from the case

1  and the matter was remanded, that it could actually lengthen

2  the litigation.

3          So I -- I take issue a little bit with the idea

4  that we were sort of forum shopping.  We didn't choose -- I

5  commend this court and Your Honor --

6          THE COURT:  To be --

7          MS. TOWNSEND:  -- for the way this case has been

8  handled.  But I -- we didn't choose to be here.  It was a

9  function of the FBI removing.  So I would just take a little

10  bit of issue with that characterization.

11          I think with respect to the Gannett case -- and

12  I'll also note that NJIT's counsel, sort of, through out his

13  argument indicated that plaintiffs knew that NJIT didn't

14  control the records or knew it didn't -- I think we all -- we

15  actually are kind of operating, using the same set of facts.

16  But it's our position, our legal position, that, in fact,

17  NJIT did have a lot more control and, in fact, did control

18  its own records in a way that there's simply not admitting

19  to.

20          So I don't think it's a question of facts.  I

21  actually think it's a legal --

22          THE COURT:  How so?

23          MS. TOWNSEND:  -- question.

24          Mr. Potter's indicated that plaintiff's cite no

25  authority for the proposition that these are, in fact -- that

1  it had any obligation whatsoever to do anything with respect

2  to these records in response to plaintiffs' OPRA requests.

3         But there's really been no dispute that NJIT and

4  Clara Williams were the custodian of these records, as

5  defined by statute, they're the public agency.  It's defined

6  again, by statute.  These are government records; again,

7  defined by statute.  The onus is on the New Jersey government

8  entity to comply with OPRA.  It's a statutory obligation.

9         THE COURT:  So you don't believe the moniker on the

10 documents and the FBI's direction were legally binding on

11 NJIT?

12        MS. TOWNSEND:  I don't think they're -- they

13 constitute a legal basis for NJIT to then deny the OPRA

14 requests.

15        Now, again, it's a starting point.  We don't -- we

16 don't contend, and I think -- I wanted to draw the Court's

17 attention to <u>Gannett</u>, because I do think it's helpful in the

18 sense that's very far from what occurred here.  I mean, the

19 Court there was concerned that you were dealing with

20 investigatory records that were actually grand jury

21 subpoenas, that were subject to a very specific exemption

22 under OPRA.  And the court made it clear that the United

23 States Attorney's Office, because they were never informed of

24 the requests, they weren't given notice of the litigation,

25 was deprived of the opportunity to assert the confidentiality

1    of the grand jury subpoenas, under OPRA.  In other words,

2    what the court in <u>Gannett</u> is saying is that the agency might

3    not know enough to be able to assert the appropriate OPRA

4    exemptions.

5            You should give notice to the federal agency or the

6    third party.  I mean, I think Mr. Potter is just saying this

7    is such a -- you know, an unusual case.  But, in fact, it's

8    not terribly uncommon for there to be a third-party

9    litigation concerning public records cases.  We often see it

10   in the context of, you know, a request made to a law

11   enforcement entity, and then for records concerning a police

12   officer, maybe the police union intervenes as a third party.

13           I will say I, again, disagree with Mr. Potter's

14   position that by doing so, by participating -- that third

15   party participating in the case, suddenly removes all of the

16   OPRA or other public records obligations from the actual

17   agency.

18           THE COURT:  Right.

19           MS. TOWNSEND:  What it does is give the third party

20   the opportunity to make their arguments.

21           THE COURT:  I understand.

22           MS. TOWNSEND:  And I think that's -- that's what

23   happened here.

24           So I think they had every right to consult with the

25   FBI --

1          THE COURT:  Okay.  Try to wrap it up.  I'm denying

2    my staff a lunch, because we start our afternoon calendar at

3    2:00.

4          MS. TOWNSEND:  I --

5          THE COURT:  Sorry.  We've gone longer than I

6    anticipated, although it's been very helpful.

7          MS. TOWNSEND:  The last two -- just the last point

8    that I would make, then, is that -- I would direct the Court

9    to -- to the Courier News case, which I think is very

10   helpful.  In that case, it was a fees issue.  And again, it

11   was -- the only issue before the court was fees.  The

12   Appellate Division held it was the custodian of the

13   government record that was responsible for fees, even if, as

14   the trial court held, it felt that it was responding to what

15   the state wanted it to do; in other words, it was doing a

16   state law enforcement function when it denied the request.

17   The county was still responsible, because it was ultimately

18   the custodian of records.  That's its statutory obligation.

19         And the other case that I would -- that I might

20   also, again, point the Court to -- again, it's an unpublished

21   decision, but the Path case that we cite, which points to a

22   protective order and doesn't allow -- and, again, I think,

23   frankly, a protective order, even if it's a stipulated

24   discovery protective order, at least has a legal foundation,

25   where you can understand why a party might not want to

 1   violate it, but even in that case, agency -- or the court

 2   concluded, the Appellate Division concluded that the agency

 3   couldn't rely on that to deny a request --

 4              THE COURT:  I think was trying to bootstrap,

 5   because it was -- those were its own records.  And then it

 6   was -- I've seen in cases too, where they were saying, oh,

 7   it's subject to confidentiality order, but they were the

 8   owner of the records.  It didn't make any sense in that

 9   context, frankly.

10              MS. TOWNSEND:  Right.  I understand.

11              And then one last note, Your Honor.  I would say

12   that Mr. Potter's ended his argument by indicating that NJIT

13   wasn't acting willfully.  It wasn't acting in bad faith.  He

14   sort of -- that's -- unfortunately, when you have a mandatory

15   fee provision, that's not an argument that has any legal

16   merit.  It doesn't have anything to do with whether or not

17   there's a factual causal nexus between the litigation that my

18   client filed in order to get public records in order to

19   report on a matter of public concern, which NJIT has

20   conceded.  It -- all it means -- and I understand why he

21   makes that point.  But unfortunately, that's not an exception

22   to OPRA's --

23              THE COURT:  Right.

24              MS. TOWNSEND:  -- mandatory fee --

25              THE COURT:  But, I mean, I understand it too,

|Hearing
|15-cv-08559, March 5, 2018

```
 1   because the cases do talk about reasonableness, and I think

 2   it sort of goes to that.

 3             Thank you very much --

 4             MS. TOWNSEND:  Thank you, Your Honor.

 5             THE COURT:  -- everyone.  This was very helpfully

 6   argued.

 7             MR. POTTERS:  Thank you, Judge.  Thank you, staff,

 8   for staying through lunch.

 9             THE COURT OFFICER:  Sorry.

10             THE COURT:  Yes.  I want to thank you.  No, no, it

11   was -- I drag them along for the ride.  I -- it was very

12   helpful to me.  Thank you.

13             THE COURT OFFICER:  All rise.

14              (Conclusion of proceedings at 1:34 P.M.)

15

16

17

18

19

20

21

22

23

24

25
```

|Hearing
|15-cv-08559, March 5, 2018
|Certification

1                           Certification

2          I, SARA L. KERN, Transcriptionist, do hereby certify

3     that the 67 pages contained herein constitute a full, true,

4     and accurate transcript from the official electronic

5     recording of the proceedings had in the above-entitled

6     matter; that research was performed on the spelling of proper

7     names and utilizing the information provided, but that in

8     many cases the spellings were educated guesses; that the

9     transcript was prepared by me or under my direction and was

10    done to the best of my skill and ability.

11         I further certify that I am in no way related to any of

12    the parties hereto nor am I in any way interested in the

13    outcome hereof.

14

15

16

17

18    s/ *Sara L. Kern*                      20th of March, 2018

19    _____      _____
      Signature of Approved Transcriber              Date

20

21
      Sara L. Kern, CET**D-338
22    King Transcription Services
      3 South Corporate Drive, Suite 203
23    Riverdale, NJ  07457
      (973) 237-6080

24

25