## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| DANIEL GOLDEN and TRACY LOCKE, <br><br> Plaintiffs, <br><br> v. <br><br> NEW JERSEY INSTITUTE OF TECHNOLOGY and CLARA WILLIAMS, in her capacity as Custodian of Records for the New Jersey Institute of Technology, <br><br> Defendants/Third-Party Plaintiffs, <br><br> v. <br><br> FEDERAL BUREAU OF INVESTIGATION, <br><br> Third Party Defendant. | **Civil Action No.** <br><br> **15-8559 (MCA) (LDW)** <br><br><br> **REPORT AND RECOMMENDATION** |

### LEDA DUNN WETTRE, U.S.M.J.

This motion presents the issue of whether plaintiffs' lawsuit under the New Jersey Open Public Records Act, N.J.S.A. § 47:1A-1 *et seq.* ("OPRA"), was a catalyst for defendants New Jersey Institute of Technology ("NJIT") and its records custodian, Clara Williams, to release records to plaintiffs, thus entitling plaintiffs to an award of $189,359 in attorneys' fees they seek from NJIT. Plaintiffs' OPRA requests to NJIT primarily sought communications between NJIT and the Federal Bureau of Investigation ("FBI"). NJIT produced to plaintiffs only those documents the FBI authorized it to release after the FBI completed its review of the documents. Because NJIT's position that it would follow the FBI's directives as to what documents could be produced

remained unchanged from the first OPRA request to the conclusion of this lawsuit, the Court finds that the requisite causal nexus between this lawsuit and the documents obtained by plaintiffs needed to deem plaintiffs prevailing parties under OPRA is absent. The undersigned therefore recommends to the District Court that plaintiffs' fee motion be **DENIED**.[1]

## BACKGROUND

Plaintiff Daniel Golden is a professional journalist who has written about American higher education. Declaration of Plaintiff Daniel Golden In Support of Plaintiffs' Motion For Attorneys' Fees ("Golden Decl.") ¶¶ 1-2, ECF No. 53-2. This action arises out of Golden's research for a book (now published) about the relationship between federal intelligence agencies and public universities. Complaint ¶¶ 3-4, ECF No. 1-1; ECF No. 53-2 ¶¶ 5-10. Plaintiff Tracy Locke is a publicist who assisted Golden with his research. ECF No. 1-1 ¶ 4. This action concerns plaintiffs' OPRA requests in furtherance of that research to NJIT, a public university, *id.* ¶ 10, concerning its communications with the FBI, the nation's domestic intelligence and security service. ECF No. 23 ¶ 4.

### I. The OPRA Requests and NJIT's Responses

In 2015, plaintiffs submitted three records requests under OPRA to Williams as NJIT's records custodian. Golden made the first request in April 2015, seeking all email communications since January 1, 2010 between NJIT and the FBI or Central Intelligence Agency ("CIA"). ECF No. 1-1 ¶ 1 & Exh. A. NJIT did not have any responsive communications with the CIA, but it

---

[1] As the only remaining issue in this case between plaintiffs and NJIT is whether to grant plaintiffs' motion for fees, the motion is dispositive under Fed. R. Civ. P. 72(b). *Cf. Fruit Flowers, LLC v. Jammala*, LLC, Civ. A. No. 14-5834 (ES) (MAH), 2016 WL 1464651 (D.N.J. Apr. 14, 2016) (adopting Magistrate Judge's Report and Recommendation on plaintiff's motion for attorneys' fees).

2

gathered responsive communications with the FBI and began to review them. ECF No. 1-1 ¶ 9; ECF No. 54-1 (Williams Cert. ¶¶ 19-26 & Exh. H).

During the review, NJIT's records custodian noticed that many of the documents bore FBI notices warning against disseminating the records without the FBI's approval. ECF No. 1-1, Exh. B (at ECF pp. 25-26); ECF No. 54-1 (Williams Cert. ¶¶ 27-28). According to NJIT, nearly 4000 pages of responsive FBI documents on their face contained directives against disclosure, ECF No. 1-1, Exh. B at ECF pp. 25-26, including the following:

> The attached documents are UNCLASSIFIED. Although UNCLASSIFIED, these reports are not to be released to the media, general public, or posted on any publicly accessible forum, to include the Internet or public websites. (ECF No. 55-1, Exh. D).

> Although UNCLASSIFIED, this information is property of the FBI and may be distributed only to members of organizations receiving this bulletin, or to cleared defense contractors. Precautions should be taken to ensure this information is stored and/or destroyed in a manner that precludes unauthorized access. (ECF 54-2 ¶ 4).[2]

> Information contained in this intelligence bulletin is for official use only. No portion of this bulletin should be released to the media, the general public, or over nonsecure Internet servers. Release of this material could adversely affect or jeopardize investigative activities. (*Id.* ¶ 5).

> This document, or any segment thereof, may not be rewritten, posted on the internet, or given to any other public or private entity without prior written or verbal approval from the [FBI]." (ECF No. 1-1 at ECF p. 25 of 41; ECF No. 54-1 at ECF p. 8).

> This document is for Official Use Only and is not to be posted on any external website and limited internal distribution to those who have a need to know." (ECF

---

[2] These excerpts from a set of Stipulated Facts between NJIT and the FBI are relied on by the Court solely for undisputed background to this dispute. Although Plaintiffs object to the submission of the Stipulated Facts on the grounds that they were not a party to the stipulation and because they argue the Stipulated Facts lacks the evidentiary value of a Certification or Declaration, the Court finds its limited use of the document appropriate and not prejudicial in any way to plaintiffs.

3

No. 54-1 at ECF p. 8).

Based on these warnings on the face of the documents collected for production, NJIT notified the FBI of plaintiff Golden's OPRA request, the nature of the responsive records, and the FBI notices. ECF No. 54-1 (Williams Cert. ¶ 28). The FBI responded that it would need to review the records before NJIT could release them. *Id.* During the course of this review, FBI agents informed NJIT that the responsive records were property of the U.S. Government and that NJIT could not release them without the FBI's approval. *Id.* ¶ 31. The FBI redacted some records and marked others as "classified" (and therefore exempt from disclosure), without NJIT's involvement. *Id.* ¶¶ 28, 30-35. In a May 27, 2015 letter to Williams, the FBI memorialized its directive that correspondence with the FBI was "not to be further distributed without the FBI's prior written approval, in conformance with" the Freedom of Information Act ("FOIA"). ECF No. 54-1 at ECF p. 113. The FBI's letter further advised NJIT that information that is "law enforcement sensitive and may implicate criminal and/or national security interests as well as information that is confidential, privileged and/or not authorized for public dissemination/distribution" is exempt from disclosure under FOIA. *Id.*; *see also* ECF No. 1-1, Exh. C.

Following the FBI's review of documents, NJIT responded to Golden's first OPRA request, providing approximately 540 pages of records. ECF No. 54-1 (Williams Cert. ¶ 38). NJIT's letter accompanying this production explained that nearly 4000 pages of responsive records were being withheld pursuant to OPRA exemptions. NJIT's response quoted the warnings against disclosure contained in the FBI notices. It also cited to a domestic security exemption to OPRA set forth in New Jersey Executive Order No. 21 (McGreevey Aug. 5, 2002), 50 N.J. Reg. 2487(a) (Jan. 2, 2018) and the OPRA exemption for security measures and surveillance techniques under

4

N.J.S.A. §§ 47:1A-1.1 and 47:1A-9. *See* ECF No. 1-1, Exh. B. NJIT further attached and referred to the FBI's May 27, 2015 letter instructing NJIT not to release records without the FBI's approval. *Id.*; *see also* ECF No. 1-1, Exh. C.

Plaintiffs submitted two additional OPRA requests in July and August 2015. ECF No. 1-1 ¶¶ 12, 17, Exhs. D & F. These requests were identical to the first OPRA request, except that they expanded the date range for the emails sought through the then-current dates of those requests. *Id.* NJIT advised the FBI of these requests and, after ascertaining that the FBI would not direct a different response to these requests than it had to the first request (ECF No. 54-1 (Williams Cert. ¶¶ 44-46, 51-53)), denied each request in an email to plaintiffs, citing to the same OPRA exemptions referenced in response to the first OPRA request and referring again to the FBI's May 27, 2015 letter. NJIT cited further to New Jersey Executive Order No. 26, which exempts from disclosure

> [r]ecords of a department or agency in the possession of another department or agency when those records are made confidential by a regulation of that department or agency adopted pursuant to N.J.S.A. 47:1A–1 et seq. [*sic*] and Executive Order No. 9 (Hughes 1963), or pursuant to another law authorizing the department or agency to make records confidential or exempt from disclosure.

Exec. Order No. 26 (McGreevey Sept. 3, 2002), 50 N.J. Reg. 3043(b) (Jan. 2, 2018); ECF No. 1-1, Exhs. E & G.

## II.    The Filing of the OPRA Complaint

In September 2015, following NJIT's response to the third OPRA request, plaintiffs filed this action in the Superior Court of New Jersey, Law Division, Essex County, against NJIT and Williams for access to the records under OPRA and the common law right of access. ECF No. 1-1. The Superior Court ordered NJIT to show cause why it should not declare NJIT to be in

violation of OPRA and the common law right of access and compel NJIT to provide access to the requested records immediately. ECF No. 1-2. NJIT requested an extension of time to respond to the Order to Show Cause. The FBI had requested that NJIT seek this extension because the FBI indicated that it intended to intervene in the action. ECF No. 54-1 (Potters Cert. ¶ 5). The court granted NJIT's request, extending the briefing deadlines and hearing date by about a month. *Id.*; ECF No. 1-3.

The FBI did not intervene in the lawsuit as NJIT anticipated. ECF No. 54-1 ¶ 6. Accordingly, NJIT filed an Answer to the Order to Show Cause. ECF No. 1 ¶ 4. NJIT also filed a Third-Party Complaint against the FBI alleging that because NJIT withheld and redacted documents at the FBI's direction, the FBI should indemnify NJIT for, *inter alia*, "any adverse exposure NJIT confronts under the OPRA statute from and against any adverse judicial determination on the propriety of the redactions and exemptions."[3] *Id.*; *see also* Third Party Complaint, ECF No. 2 ¶ 16.

In December 2015, following oral argument on the Order to Show Cause, the Superior Court entered an Order providing that the issues raised in the Order to Show Cause were

> premature for adjudication based on (a) the FBI and Department of Justice having advised of their need for additional time to address both the FBI's course of action and to commence their review of the redacted and exempted documents and (b) the Court's recognition of defendant NJIT's compliance with the written direction of the FBI not to produce documents.

ECF No. 54-2 ¶ 14. The Order directed the FBI to decide its course of action in addressing the issues raised by the lawsuit and simultaneously commence review of the redacted and exempted

---

[3] NJIT also filed a counterclaim against plaintiffs for allegedly failing to pay $26.56 in costs pursuant to the first OPRA request. The parties later stipulated to dismissal of that claim. ECF No. 1-4.

6

records. *Id.*

### III. Proceedings in this Court

In December 2015, the FBI filed a Notice of Removal to this Court. It asserted that the action was removable as one against an agency of the United States, pursuant to 28 U.S.C. § 1442(a)(1). ECF No. 1 ¶ 8.

Shortly after removal, the FBI requested a stay of discovery from this Court pending adjudication of its then-contemplated motion to dismiss, including a stay of its time to respond to requests for admission ("RFAs") that NJIT had served upon it. ECF No. 3. NJIT responded on December 17, 2015, objecting to a stay. ECF No. 5. It asserted that the FBI's failure to intervene in the action presented NJIT with a "Hobson's choice" between complying with the FBI's directive not to produce documents or ignoring that directive and possibly being ordered to pay plaintiffs' fees under OPRA. *Id.* The RFAs, it asserted, merely sought to confirm that "the FBI made *all* of the redactions and *all* documents withheld from production [to plaintiffs] were done so at the express direction of the FBI." *Id.* (emphasis added). According to NJIT, obtaining these responses was "critically important" for it to address a contemplated fee application by plaintiffs under OPRA. *Id.* The Court stayed the FBI's time to respond to discovery pending discussions to be held with the undersigned Magistrate Judge. ECF No. 8.

While the course of the litigation still was being discussed among counsel and with the Court, the FBI in February 2016 filed a Counterclaim against NJIT reflecting the FBI's position, expressed previously in its May 27, 2015 letter, that NJIT was not to release any documents to plaintiffs in response to the OPRA request without its approval. *See* ECF No. 23. The FBI's Counterclaims sought declarations that NJIT was enjoined from releasing documents the FBI had

7

created and sent to NJIT. The FBI averred that the documents were exempt from disclosure under OPRA and FOIA for multiple reasons, including because they were only provided to NJIT on condition of nondisclosure, because they were part of federal law enforcement investigations and might jeopardize ongoing and future enforcement proceedings, because they reflected sensitive law enforcement information such as the identities of confidential informants, FBI personnel, subjects, witnesses and investigative techniques, and because they "contain[ed] critical intelligence to detect and prevent violent crime and terrorism in the United States before such acts occur." *See id.* ¶¶ 18-19, 46, 51, 55-56, 58. The FBI further averred that it had invited plaintiffs prior to the filing of the lawsuit to submit a FOIA request to it for the information they sought, but that plaintiffs had not done so, instead choosing to seek documents solely from NJIT under OPRA. *Id.* ¶¶ 15, 20, 21.[4]

Following a series of Court conferences (on December 18, 2015, January 4, 22 and 29, 2016, and March 3, 2016), an agreement was reached in early March 2016 as to how the lawsuit would proceed. At that time, the parties jointly requested a stay of the litigation to allow the FBI time to review the records in its possession that were responsive to plaintiffs' OPRA requests, make necessary redactions, and release non-exempt, responsive records. ECF Nos. 24, 25. The Court granted the parties' request for a continued stay of all deadlines while the FBI completed its review and required status updates throughout that document review process, both in writing and at telephone conferences. *See* ECF Nos. 26, 28, 30, 33, 36. Over the course of several months, the FBI continued to review the records, identifying which records and portions of records NJIT

---

[4]  The FBI is not one of the "public agencies" subject to OPRA, N.J.S.A. § 47:1A-1.1, but it is subject to FOIA.

8

could release. NJIT passed along records to plaintiffs on a rolling basis that the FBI had identified as non-exempt and that the FBI had Bates-stamped for production. Each production included a cover letter from NJIT's counsel and a copy of FBI correspondence confirming that it had withheld certain records pursuant to exemptions. *See* ECF No. 37-2.

Ultimately, NJIT produced about 3445 pages of responsive records and 379 partially redacted records. *See* Joint Status Reports, ECF Nos. 27, 29. The parties jointly informed the Court in March 2017 that due to the publication deadlines for Golden's book, plaintiffs had determined not to challenge the FBI's assertion that the redacted information in the produced documents and the remainder of the records not produced were exempt from disclosure. ECF No. 34. The book Golden subsequently published included information he had obtained from NJIT's production. *See* Golden Decl. ¶ 10, ECF No. 53-2.

In May 2017, the parties reported that the only issues remaining in the case were plaintiffs' proposed application for attorneys' fees under OPRA and NJIT's claim for indemnification against the FBI if fees were awarded to plaintiff. After the parties submitted requests to file various motions, it was determined with the consent of the parties that the instant motion for fees would be briefed first, in accordance with a briefing schedule requested by counsel. ECF No. 52.

Plaintiffs' motion for fees seeks an award of a total of $189,359 in fees from NJIT. ECF No. 53. This is comprised of a lodestar calculation of $134,745, plus a twenty-five percent enhancement. Plaintiffs acknowledge that the vast majority of attorney hours spent on this case were expended after removal of the action to this Court. *Id.* at 28. During this period, there was only a three-month period, from removal in December 2015 to March 7, 2016, when a consensual stay of litigation was not formally in place. *See* ECF Nos. 1, 26. The Court also notes that

9

approximately one-third of the total hours for which plaintiffs seek an award of fees was time spent drafting this fee motion. *See* ECF No. 52 at 28.

NJIT opposes the motion. ECF No. 54. The FBI has taken no position. The Court held oral argument on the motion on March 5, 2018, and reserved decision.

## DISCUSSION

Plaintiffs move for an award of attorney's fees against NJIT, arguing that they are prevailing parties entitled to a reasonable award of attorney's fees under OPRA's mandatory fee-shifting provision. Plaintiffs contend that their filing of this action caused NJIT's voluntary production of responsive records previously withheld, justifying an award of fees to them as "prevailing parties" under the catalyst theory outlined by the New Jersey Supreme Court in *Mason v. City of Hoboken*, 196 N.J. 51, 64 (2008). They further seek an enhancement of the fee award because of a claimed substantial risk of nonpayment in their attempts to secure records.

NJIT opposes the motion, arguing that plaintiffs' lawsuit was not a catalyst for NJIT's production of the responsive records because NJIT was acting pursuant to directives from the FBI not to produce records, and because the FBI assumed complete control over the review, redaction, and release of records. ECF No. 54. Plaintiffs' action, NJIT argues, did not cause any change, voluntary or otherwise, in its behavior. It also argues that the FBI assumed the role of *de facto* records custodian, and therefore the Court should not consider NJIT to be a records custodian within the meaning of OPRA from which a plaintiff could obtain fees. NJIT further argues that the fee amounts that plaintiffs seek to be awarded are not reasonable. *Id.*.

### A. Legal Standards

The New Jersey Legislature's purpose in enacting OPRA was "'to maximize public

10

knowledge about public affairs in order to ensure an informed citizenry and to minimize the evils inherent in a secluded process.'" *Kovalcik v. Somerset Cty. Prosecutor's Office*, 206 N.J. 581, 588 (2011) (quoting *Mason*, 196 N.J. at 64). OPRA requires that "government records shall be readily accessible for inspection, copying, or examination by the citizens of [New Jersey], with certain exceptions." N.J.S.A. § 47:1A-1. Certain categories of information and documents are excluded from OPRA, such as records of ongoing investigations and personnel records, among others. *See Kovalcik*, 206 N.J. at 588 (listing several excepted records (citing N.J.S.A. §§ 47:1A-1.1, 47:1A-1.2, 47:1A-3, 47:1A-10)). If a person is denied access to a record by the record's custodian, he or she may challenge the denial by filing a complaint in the Superior Court of New Jersey. N.J.S.A. § 47:1A-6.

OPRA provides that "[a] requestor who prevails in any proceeding shall be entitled to a reasonable attorney's fee." N.J.S.A. § 47:1A-6. This fee-shifting provision is an exception to the "American Rule" requiring parties to bear their own legal fees regardless of the outcome of litigation. An OPRA plaintiff is entitled to fees under the "catalyst theory," even if the action filed to enforce OPRA rights is resolved before a court's adjudication of the merits, where it demonstrates: "(1) 'a factual causal nexus between plaintiff's litigation and the relief ultimately achieved'; and (2) 'that the relief ultimately secured by plaintiffs had a basis in law.'" *Mason*, 196 N.J. at 76 (citation omitted).

NJIT challenges plaintiffs' right to fees as a "catalyst" only under the first prong of that theory, implicitly conceding the second prong is met. It contends that plaintiffs have not shown a "factual causal nexus" between their filing of this action and their ultimate receipt of documents from NJIT. Determination of the causal nexus prong requires the Court to "conduct [a] fact-

11

sensitive inquiry on a case-by-case basis, evaluating the reasonableness of, and motivations for, an agency's decisions, and viewing each matter on its merits." *Id.* at 79. The burden rests on the litigant seeking fees to make this showing. *Id.* at 76.

An OPRA plaintiff is not a prevailing party simply because documents are produced by the defendant after the lawsuit is filed. *See Spectraserv, Inc. v. Middlesex County Utilities Auth.*, 416 N.J. Super. 565, 583 (App. Div. 2010) (citing *Mason*, 196 N.J. at 78); *North Jersey Media Group Inc. v. State of New Jersey Department of Law & Public Safety*, 2016 WL 4216664, at *8-9 (App. Div. Aug. 11, 2016). Such an assumption would contradict the New Jersey Supreme Court's rejection of a rebuttable presumption that the plaintiff is a prevailing party in that instance. *Mason*, 196 N.J. at 77; *Grieco v. Borough of Haddon Heights*, 449 N.J. Super. 513, 521 (Law Div. 2015). Rather, to be deemed a prevailing party, the plaintiff must demonstrate that "the complaint brought about change (voluntary or otherwise) in the custodian's conduct." *Spectraserv*, 416 N.J. Super. at 583 (citations omitted). The lawsuit must be a "necessary and important factor in obtaining relief." *Smith v. Hudson County Register*, 422 N.J. Super. 387, 394 (App. Div. 2011) (citation omitted). Although a plaintiff need not obtain all of the relief sought to be deemed a prevailing party, "there must be a resolution that affects the defendant's behavior toward the prevailing plaintiff." *Id.* at 394 (internal quotation marks and citation omitted); *see also Schmidt v. City of Gloucester City*, 2012 WL 3064254, at *6 (App. Div. July 30, 2012) ("[A] requestor may be awarded attorney's fees even if the OPRA request is fulfilled pursuant to a settlement, so long as the relief resulted from the litigation.").

The reasonableness of, and motivations for, a public entity's decision to deny production of records is an important consideration in the causal nexus analysis. *Mason*, 196 N.J. at 79;

12

*Grieco*, 449 N.J. Super. at 520. This fact-sensitive inquiry "must take into account the fact that OPRA 'is designed both to promote prompt access to government records and to encourage requestors and agencies to work together toward that end by accommodating one another.'" *Grieco*, 449 N.J. Super. at 519 (quoting *Mason*, 196 N.J. at 78). As set forth in *Stop & Shop Supermarket Co. v. County of Bergen*, the New Jersey "Supreme Court in *Mason* refused to presume OPRA litigants are entitled to counsel fees even when records are produced after suit is filed," concerned that "such an entitlement could 'upend the cooperative balance OPRA strives to attain,' give plaintiffs 'an incentive to file suit' to obtain 'an award of attorney's fees,' and give agencies 'reason not to disclose documents voluntarily.'" 450 N.J. Super. 286, 292-93 (App. Div. 2017) (quoting *Mason*, 196 N.J. at 78-79).

### B. Analysis

Plaintiffs have not carried their burden under the facts here of demonstrating that their lawsuit was the factual causal nexus for NJIT's release of records to plaintiffs after the filing of this lawsuit. The Court therefore recommends the District Court find that plaintiffs are not entitled to prevailing-party fees under the catalyst theory.

Plaintiffs contend that this lawsuit caused NJIT's change of position in releasing records in two respects. First, they argue that after their filing of this action, NJIT abandoned its reliance on OPRA exemptions as a basis to withhold documents responsive to the OPRA requests. ECF No. 53-1 at 11. Second, plaintiffs posit that the records produced by NJIT as a result of the procedure agreed to by all parties after the lawsuit was removed to this Court, whereby the FBI would review and release on a rolling basis documents that it regarded as subject to production, constituted a change in position on NJIT's part brought about by the lawsuit.

13

The record does not support plaintiffs' position in either respect. Rather, it is clear that NJIT's stance in not producing records unless and until authorized by the FBI never wavered. This was its position prior to the litigation in responding to the OPRA requests and that it maintained through the filing of the lawsuit and up until the litigation concluded with plaintiffs' decision not to challenge the FBI's remaining redactions and withholding of documents. In that respect, plaintiffs' lawsuit brought about no change, voluntary or otherwise, in NJIT's conduct as records custodian.

NJIT asserted OPRA exemptions in response to plaintiffs' three OPRA requests. These were exemptions for information concerning domestic security and surveillance techniques. NJIT has maintained, and neither the FBI nor plaintiffs dispute, that it asserted these exemptions at the behest of, and on behalf of, the FBI. *See* ECF No. 2 ¶¶ 3-14, ECF pp. 16-17; ECF No. 23; ECF No. 54-2; ECF No. 60 at ECF pp. 5-7. Regardless of its reason for asserting these exemptions, NJIT never withdrew them, either formally or informally. The Court disagrees with plaintiffs' argument that NJIT's assertion of a third-party claim against the FBI and NJIT's acknowledgement that the FBI's conduct might expose it to a fee assessment constituted an informal withdrawal of these exemptions. NJIT's assertion in its third-party claim against the FBI (and elsewhere) of a right to be indemnified by the FBI was not based on any doubt it expressed as to the validity of the asserted exemptions. Rather, it plainly pursued indemnity from the FBI simply to limit its exposure in the event the FBI's assertion of exclusive control over the documents resulted in its being assessed fees to plaintiffs. *See* Third Party Complaint, ECF No. 2 ¶¶ 1-21. Thus, the record demonstrates that NJIT's assertion of OPRA exemptions on behalf of the FBI was unaffected and unchanged by plaintiffs' filing of this lawsuit.

14

To the extent plaintiffs further assert that the production of records during the pendency of this lawsuit was a change in position by NJIT brought about by the lawsuit, the Court again disagrees. Records were produced as a result of the FBI's review process, which was agreed by all parties; there was no change in *NJIT's* position, just in that of the FBI.[5] NJIT simply produced the records after the FBI reviewed, redacted and Bates-stamped them. This was the same procedure NJIT followed both before and after the lawsuit was filed.

The Court finds plaintiffs' reliance on *K.L. v. Evesham Township Board of Education*, 423 N.J. Super. 337 (App. Div. 2011) misplaced insofar as they contend that the award of fees under the catalyst theory there supports a fee award here. In *K.L.*, the award of fees was not based solely on the production of documents after the filing of the lawsuit. The law is clear that the mere production post-lawsuit of documents is not sufficient basis *per se* to award fees under the catalyst theory. *See Spectraserv, Inc.*, 416 N.J. Super. at 583 ("A requestor . . . is not a prevailing party simply because the agency produced documents after an OPRA suit was filed."). The *K.L.* court found that the lawsuit had been a catalyst for the defendant Board's disclosure of a document after the lawsuit was filed because the "Board declined to disclose this document until plaintiff filed his OPRA lawsuit *and* the court ordered *in camera* review." 416 N.J. Super. at 347, 362-63 (emphasis added). Thus, in *K.L.*, the plaintiff's obtaining a favorable court order was deemed a factor precipitating the production of a document during the lawsuit. In contrast here, the production of

---

[5] The production of the records was a post-lawsuit change in the *FBI's* position to be certain. And had plaintiffs sought the same records from the FBI pursuant to a FOIA request, as the FBI contends it invited them to do, ECF No. 23, plaintiffs' counsel acknowledged at oral argument that they would have had a right to seek fees directly from the FBI. ECF No. 60 at 20-21. But plaintiffs did not serve a FOIA request on the FBI, and the catalyst analysis here focuses solely on defendant NJIT's conduct as records custodian under OPRA.

documents post-lawsuit was unrelated to any action taken by the Court. Indeed, plaintiffs do not argue otherwise.

Moreover, the Court in assessing the factual causal nexus prong of the catalyst theory is required to consider "the reasonableness of, and motivations for," the custodian's conduct in denying access to records subject to OPRA. *Mason*, 951 N.J. at 79. Here, the Court cannot deem NJIT's conduct to have been unreasonable. The FBI is the country's foremost domestic security agency. It made clear in no uncertain terms to NJIT that the records could not be produced without its having reviewed and approved the production, with redactions it deemed appropriate. The FBI maintains that there is sensitive law enforcement information in the documents that would jeopardize ongoing investigations and endanger individuals if revealed. *See* ECF No. 23. The FBI accordingly sought time to conduct its review of the records, and NJIT acted in a manner that sought to enable that to occur. Indeed, the Superior Court Judge who held the show-cause hearing prior to removal to this Court also acknowledged the legitimacy of providing additional review time to the FBI, when she found plaintiffs' OPRA suit "premature for adjudication based on (a) the FBI and Department of Justice having advised of their need for additional time to address both the FBI's course of action and to commence their review of the redacted and exempted documents and (b) the Court's recognition of defendant NJIT's compliance with the written direction of the FBI not to produce documents." ECF No. 54-2 ¶ 14.

This Court, too, recognized upon removal of the case here that the course of action best designed to balance plaintiffs' access rights with the FBI's security concerns was to confer additional review time on the FBI, if the parties would agree. Plaintiffs ultimately acquiesced to this procedure, and the Court was not called on by the parties during the stay period to do anything

16

other than monitor their progress.

The Court further notes that despite NJIT's cooperating with the FBI's demand that it not release documents to plaintiffs without the FBI's approval, NJIT also sought to facilitate a prompt response to plaintiffs' OPRA requests, both by encouraging plaintiffs to serve a FOIA request for the records directly upon the FBI and by impleading the FBI as a third-party defendant. The pressure it placed on the FBI by impleading it in this action no doubt assisted the plaintiffs in obtaining the records. Indeed, after plaintiffs received the majority of documents from the FBI through the process agreed by the parties under which the FBI would review and produce documents on a rolling basis, plaintiffs determined not to challenge the FBI's remaining redactions and withholdings, having obtained through this process information that Golden was able to use in his book.

Plaintiffs' position on what more NJIT could have done to be deemed by plaintiffs to have acted "reasonably" boils down to an assertion that NJIT should have defied the FBI's instruction not to release the documents without its approval. Enforcing this position, in the Court's view, would not only disregard the interests of law enforcement, but also would not be consistent with OPRA. The review and production process followed by the parties in this case, and in which plaintiffs to their credit agreed, seems to the Court to fulfill the goal of OPRA "'both to promote prompt access to government records and to encourage requestors and agencies to work together toward that end by accommodating one another.'" *Grieco*, 449 N.J. Super. at 519 (quoting *Mason*, 196 N.J. at 78). It would be contrary to OPRA to assess fees against NJIT under these circumstances, where the parties acted in a manner encouraged by OPRA.

Further, plaintiffs' advocating of a position that would require NJIT to disregard the FBI's concerns about release of potentially law enforcement sensitive information is not in keeping with the respect for confidentiality interests reflected in other persuasive OPRA decisions. In *Gannett New Jersey Partners, LP v. County of Middlesex*, 379 N.J. Super. 205 (App. Div. 2005), for instance, the court recognized that, at times, a records "custodian may not be in a position to discharge [the] burden [of stating the specific basis for a denial of access] if the asserted confidentiality interest in a document is not that of the government agency upon which the document request was made but rather another government agency." *Id.* at 215. There, it noted that the custodian for Middlesex County "was not in a position to know" whether release of grand jury subpoenas demanded under OPRA would harm an ongoing criminal investigation, and rather only the U.S. Attorney's Office, the non-party that had served the subpoenas, would be in a position to assert applicable exemptions. The Appellate Division instructed that under such circumstances, "a court should presume that the release of grand jury subpoenas could interfere with the federal criminal investigation and uphold a denial of access under OPRA." *Id.* at 215. Similarly here, NJIT was not in a position to know how the release of its communications with the FBI might impact law enforcement activities and compromise individuals involved in those activities, and the FBI in any event forbade NJIT to make that call. NJIT's conduct as custodian in this difficult situation was reasonable. Its motivation was never to deprive plaintiffs of the documents, but rather to balance the competing concerns.

This conclusion is further supported by the Superior Court of New Jersey, Appellate Division's decision in *Spectraserv, Inc. v. Middlesex County Utilities Auth.*, 416 N.J. Super. at 565, in which the Appellate Division affirmed a denial of fees to an OPRA plaintiff, finding that

18

the production of documents was not causally connected to the lawsuit despite the lower court's having ordered certain documents to be produced to the plaintiff. In that case, the records custodian withheld certain information responsive to the plaintiff's OPRA requests that the custodian viewed as confidential, proprietary or trade secrets of a third party and proposed a production arrangement that would enable it to respond to the requests, which the plaintiff rejected in favor of filing an OPRA suit. The trial court adjudicating the OPRA suit ultimately ordered production of the documents after the third party withdrew its objection. *Id.* at 568-74. In affirming the trial court's denial of prevailing party fees under OPRA, the Appellate Division focused on the reasonableness of the custodian's conduct in proposing a production arrangement that would enable it to respond to the plaintiff's broad OPRA requests while protecting the third party's confidentiality interests. The court also concluded that the plaintiff could not demonstrate that the custodian would not have ultimately produced the documents absent the OPRA suit. Accordingly, the OPRA lawsuit was not a catalyst for the production. *Id.* at 579-80, 584.

Here, as in *Spectraserv*, NJIT as custodian sought to balance the rights of the OPRA requestors with the confidentiality interests of the FBI, a third party to the OPRA requests. It did not act in a manner inimical to OPRA by seeking to evade its responsibilities as custodian under OPRA, but rather in a manner designed to promote "'compromise and efforts to work through certain problematic requests' by accommodating one another." *Id.* at 579 (quoting *Mason*, 196 N.J. at 76, 78). NJIT's participation in pressing the FBI to address the documents sought by the OPRA requests and then facilitating their review and production to the plaintiffs (both before this action was filed, and again when the FBI commenced its second review of the documents under

19

the process overseen by this Court), was reasonable. Plaintiffs have not demonstrated that NJIT's role in this production process was a result of plaintiffs' filing this lawsuit.

For the foregoing reasons, the Court finds that there was no factual causal nexus between the filing of this lawsuit and NJIT's production of documents to the plaintiffs. Therefore, it respectfully recommends to the District Court that it find that plaintiffs are not entitled to fees as a prevailing party under OPRA under the catalyst theory.[6]

## CONCLUSION

For the foregoing reasons, the undersigned recommends that the District Court deny plaintiffs' motion for attorneys' fees. (ECF No. 52). The parties are advised that they have 14 days after service of this Report and Recommendation to file any objections to it.

Dated: April 25, 2018

*Leda Dunn Wettre*
Leda Dunn Wettre, U.S.M.J.

cc: Hon. Madeline C. Arleo, U.S.D.J.
    Clerk of Court

---

[6] Given this conclusion, the undersigned does not reach NJIT's remaining arguments for denying or limiting a fee award to plaintiffs.

20